DIEBOLD, INCORPORATED, Petitioner,

v.

F. Ray MARSHALL, Secretary of Labor,
and Occupational Safety and Health
Review Commission, Respondents.

No. 76–1278.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 14, 1977.

Decided Nov. 3, 1978.

General Counsel, Occupational Safety & Health Review Com'n, Washington, D. C., William J. Kilberg, Stephen A. Bokat, Baruch A. Fellner, Allen H. Feldman, Jeffrey Lewis Berger, Michael H. Levin, U. S. Dept. of Labor, Washington, D. C., William S. Kloepfer, Assoc. Regional Sol., U. S. Dept. of Labor, Cleveland, Ohio, for respondents.

Before WEICK and LIVELY, Circuit Judges, and WALINSKI,* District Judge.

WALINSKI, District Judge.

Petitioner Diebold, Inc. seeks judicial review of a decision by the Occupational Safety and Health Review Commission (hereinafter "the Commission") that Diebold has violated a safety regulation promulgated by the Secretary of Labor pursuant to the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651–78 (hereinafter "the Act"). Diebold contends that the Commission erred in its interpretation of the applicable regulations and that, even if the Commission's interpretation is correct, the regulations are so vague as to be unenforceable under the due process clause of the Fifth Amendment. For the reasons which follow, we accept the Commission's interpretation of the regulations in question but hold that on the facts of this case their application to Diebold would be a denial of due process. We therefore set aside that portion of the Commission's order which is challenged on appeal.

I.

Diebold is a manufacturer of security files, safes, and other record handling and retrieval systems. At the times which are relevant here, Diebold operated plants at Hamilton, Wooster, and Malvern, Ohio, where its employees used various kinds of presses, including press brakes, to shape a variety of metals for use in the assembly of Diebold's products.

Hulse Hays, Jr., Roger A. Weber, Cincinnati, Ohio, for petitioner.

The press brake, which is the kind of machine at issue on this appeal, is a species

* The Honorable Nicholas J. Walinski, Judge, United States District Court for the Northern District of Ohio, sitting by designation.

of large mechanical power press used primarily for bending sheet metal. The "stock," or metal to be formed, is placed on a bottom die attached to the bed of the machine, and the operator then causes the metal to be struck with a matching top die which is attached to a movable ram mounted on rails. The area between the dies, i. e., the area where the stock is placed, is called the "point of operation." When the press brake is in use, the descending ram strikes the point of operation with a pressure of several hundred tons per square inch.

Based on inspections of Diebold's plants in January, March, and July, 1974, the Secretary issued a citation as to each plant charging Diebold with having violated § 5(a)(2) of the Act, 29 U.S.C. § 654(a)(2),[1] by failing to provide point of operation guards on its press brakes as require by 29 C.F.R. § 1910.212. The Secretary proposed penalties totalling $190. Diebold contested the citations and proposed penalties, and the charges as to all three plants were consolidated for administrative review.[2]

In his decision, the Administrative Law Judge vacated the citations and proposed penalties, having concluded that a regulation specifically applicable to mechanical power presses, 29 C.F.R. § 1910.217, relieved press brakes from any point of operation guarding requirement. The Commission thereupon called the case for review, 29 U.S.C. § 661(i), and a Commission majority of 2–1 reversed the Administrative Law Judge, reinstating the citations and proposed penalties. The Commission majority determined that, although press brakes are excluded from the guarding requirements applicable to power presses (§ 1910.217), they remain subject to the requirements which the regulations set out for machines generally (§ 1910.212). In addition, the Commission rejected Diebold's contentions that the regulations were improperly promulgated, impossible to comply with, and impermissibly vague. *Diebold, Inc.* (OSHRC Docket Nos. 6767, 7721, 9496), —— OSAHRC ——, 3 BNA–OSHC 1897, 1975–76 CCH–OSHD ¶ 20,333 (1976), *rev'g,* 1974–75 CCH–OSHD ¶ 19,214 (Ad.L.Judge, 1975).

Diebold then filed the instant petition for judicial review of the Commission's decision pursuant to 29 U.S.C. § 660(a), advancing the same claim that it made before the Commission.

## II.

The Act's central purpose is "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources." 29 U.S.C. § 651(b). As the principal method for achieving this ambitious end, the Act authorizes the Secretary of Labor to promulgate national standards of occupational safety and health, 29 U.S.C. § 655, and places upon each covered employer[3] a duty to comply with the promulgated standards. 29 U.S.C. § 654(a)(2).

In general, the Secretary's standard-setting authority is to be exercised as the product of substantial prior research, advisory committee review, and notice-and-comment rule-making. 29 U.S.C. § 655(b). Congress recognized, however, that these procedures would be highly time-consuming and in the first years of the Act would run counter to the congressional interest in "immediately providing a nationwide minimum level of health and safety." *S.Rep.No. 1282,* 91st Cong. 2d Sess., 1970 *U.S.Code Cong. & Admin.News,* pp. 5177, 5182. For that reason the Act provided that, "as soon as practicable" and without regard to the

---

1. Each employer—

   \*  \*  \*  \*  \*  \*

   (2) shall comply with occupational safety and health standards promulgated under this Act.

   29 U.S.C. § 654(a).

2. Diebold was also charged in the same citations with having failed to provide point of operation guarding on several punch presses. The Administrative Law Judge's decision va-

cating the citation as to these machines was affirmed by the Commission, and the Secretary has not raised any challenge to that determination in the instant proceeding.

3. The term "employer" means a person engaged in a business affecting commerce who has employees, but does not include the United States or any State or political subdivision of a State.

   29 U.S.C. § 652(5).

usual rule-making procedures, the Secretary was to adopt as his own any existing health and safety standards already promulgated under federal law ("established Federal standards") or issued by a nationally-recognized standards-setting organization based on full public discussion and on the substantial agreement of those affected ("national consensus standards"). 29 U.S.C. § 655(a). Notice-and-comment requirements could be dispensed with, thereby permitting establishment of the "nationwide minimum level" of safety with the desired rapidity, because these § 655(a) "interim standards"[4] would have already been subjected to close public scrutiny through the use of equivalent procedures in their original issuance.

Shortly after the Act's passage, the Secretary exercised his § 655(a) authority and promulgated a voluminous collection of standards drawn from existing federal and consensus sources. 36 Fed.Reg. 10466 (May 29, 1971), *codified at* 29 C.F.R. Part 1910. Among these was the general machine guarding requirement which Diebold is charged with having violated in the instant case. The standard, 29 C.F.R. § 1910.212, embodies an "established Federal standard" previously promulgated by the Secretary of Labor under the Walsh-Healey Public Contracts Act, 41 U.S.C. §§ 35–45. It provides in pertinent part:

> (a) *Machine guarding*—(1) *Types of guarding.* One or more methods of machine guarding shall be provided to protect the operator and other employees in the machine area from hazards such as those created by point of operation * *.
>
> *    *    *    *    *    *
>
> (3) *Point of operation guarding.*
>
> *    *    *    *    *    *
>
> (ii) The point of operation of machines whose operation exposes an employee to

injury, shall be guarded. The guarding device shall be in conformity with any appropriate standards therefor, or, in the absence of applicable specific standards, shall be so designed and constructed as to prevent the operator from having any part of his body in the danger zone during the operating cycle.

> *    *    *    *    *    *
>
> (iv) The following are some of the machines which usually require point of operation guarding:
>
> *    *    *    *    *    *
>
> (*d*) Power presses.

It is conceded that Diebold's press brakes are a form of mechanical power press, that their operators are exposed to point of operation injuries, and that no guarding devices are used to protect them from this hazard. In the Secretary's view, those facts establish a violation of § 1910.212 beyond any possibility of dispute. Diebold advances several reasons for its position that the regulation cannot properly be construed as applying to press brakes.

The company argues first that, despite the facial breadth of § 1910.212, the regulation's Walsh-Healey predecessor was never understood to require point of operation guarding on press brakes; indeed, it claims, such guarding was impossible in 1971,[5] the year in which the Secretary promulgated the Walsh-Healey regulation as an "established Federal standard" under the Act. Thus, in Diebold's view, the standard could not have been intended to cover press brakes, and the Secretary's application of it to such machines necessarily modifies the substantive content of the Walsh-Healey original without adherence to the rule-making procedures which the Act prescribes for such modifications.

---

4. The "interim" label was affixed to the § 655(a) standards by the Conference Committee report on the final version of the Act. *Conf.Rep.No. 1765,* 91st Cong. 2d Sess., 1970 *U.S.Code Cong. & Admin.News,* pp. 5228, 5229. In point of fact, the vast majority of standards in force have been, and continue to be, "interim standards" adopted pursuant to the Secretary's § 655(a) authority.

5. Diebold raises as a separate issue its claim that press brake guarding remains impossible today. Because of our disposition of the due process claim, part III, *infra,* we do not reach this question. *But see* text and notes following n. 16, *infra.*

■ We agree with Diebold's premise that 29 U.S.C. § 655(a) required adoption of "established Federal" and "national consensus" standards without substantive modification, and that the Secretary may not enforceably construe a § 655(a) standard to impose requirements which the standard's source did not impose.[6] *See Dunlop v. Ashworth,* 538 F.2d 562, 563 (4th Cir. 1976); *Diamond Roofing Co., Inc. v. OSHRC,* 528 F.2d 645, 650 (5th Cir. 1976). Thus, we also agree that the question whether § 1910.212 applies to press brakes is determined by whether its Walsh-Healey source applied to press brakes.

■ As Diebold's arguments make clear, however, resolution of that issue depends in large part upon essentially historical or factual determinations relating to industrial and technological conditions at the time the standard was promulgated. Those are precisely the kinds of determinations which the Commission is peculiarly fitted to make by virtue of its members' "education, training, or experience." 29 U.S.C. § 661(a). As a general matter, the Commission is entitled to great deference in its reasonable interpretations of regulations promulgated under the Act. *Dunlop v. Ashworth, supra,* 538 F.2d at 563; *Brennan v. OSHRC (Ron M. Fiegen, Inc.),* 513 F.2d 713, 715–16 (8th Cir. 1975). *Cf. Dunlop v. Rockwell International,* 540 F.2d 1283, 1289 (6th Cir. 1976) (deference to Commission constructions of the Act itself). That deference is especially appropriate in a case like the present one where the Commission has expressly addressed historical and technological arguments and resolved them adversely to the petitioner.

■ Thus, we find no reason to second-guess the Commission's rejection of the claim that industrial practice and belief contradicted the applicability to press brakes of § 1910.212's Walsh-Healey source. To be sure, the Secretary has noted on appeal that press brake guarding is rarely used in practice, a fact which certainly indicates a widespread belief that guarding was not required. However, assuming that no one in industry was aware of any guarding requirement applicable to press brakes, we do not consider that fact to be dispositive of the guarding standard's meaning. It is true that the Act's authorization of expedited rule-making was based on a congressional belief that industry would already be thoroughly familiar with the "interim standards." *S.Rep.No. 1282, supra,* 1970 *U.S. Code Cong. & Admin.News* at 5182. As has become obvious in the years since the Act's passage, however, Congress was mistaken: Neither the "established Federal" nor the "national consensus" standards were widely known to or understood by industry at the time of their promulgation by the Secretary. *See* Gov't Res. Corp., *Occupational Safety and Health: A Policy Analysis,* pp. i, 21–22 (1973); N. Ashford, *Crisis in the Workplace: Occupational Disease and Injury,* pp. 248, 295 (Ford Foundation Rep. 1976). *See, e. g., Brennan v. Smoke-Craft, Inc.,* 530 F.2d 843, 845 (9th Cir. 1976).[7] Thus, we can hardly conclude that wide-

---

**6.** The Secretary concedes that his § 655(a) authority extended only to the adoption of source standards without substantive modification and that any modification would require use of the full rule-making procedures set out in 29 U.S.C. § 655(b). Thus, he also agrees that the expedited procedures used in promulgating § 1910.212 would render the standard unenforceable if and to the extent that it varied the requirements of its source. *Cf. United States v. Finley Coal Co.,* 493 F.2d 285 (6th Cir.), *cert. denied,* 419 U.S. 1089, 95 S.Ct. 679, 42 L.Ed.2d 681 (1974). Of course, the Secretary could properly extend the § 655(a) standards to cover employees whose employers were not governed by the source standards, as long as the extension did not operate to create a protection which had not been afforded to workers who were cover-

ed by the source. *See S.Rep.No. 1282, supra,* 1970, *U.S.Code Cong. & Admin.News* at 5182. *Compare, e. g., Underhill Construction Corp. v. Secretary of Labor,* 526 F.2d 53 (2d Cir. 1975), *with Langer Roofing & Sheet Metal, Inc. v. Secretary of Labor,* 524 F.2d 1337 (7th Cir. 1975).

**7.** Congressman William Steiger, one of the Act's principal sponsors, has ruefully noted that, despite congressional expectations to the contrary, the sources of the § 655(a) standards "are not widely used, are hardly recognized, and if they were recognized, nobody knew what they were." *The Architect, the Engineer, and OSHA,* pp. 7–8 (Proceedings of the conference of the Amer. Inst. of Architects, June 25–26, 1973).

spread ignorance of a press brake guarding requirement would be sufficient to rebut the Commission's contrary conclusion that such a requirement existed in 1971.

We are similarly unpersuaded that the Commission erred in rejecting Diebold's claim that the Walsh-Healey standard could not have required press brake guarding because such guarding was impossible in 1971. In the first place, the standards promulgated under § 655(a) appear to have included some whose sources indisputably set impossible requirements. *See, e. g., AFL–CIO v. Brennan,* 530 F.2d 109, 120–22 (3d Cir. 1975) ("national consensus" standard imposing a universal "no-hands-in-dies" requirement for power presses, revoked by the Secretary as impossible). Second, we recognize that national safety legislation is not limited to the present "state-of-the-art" but may properly force technological advances through the promulgation of requirements which are beyond what industry is immediately capable of attaining. *See Society of Plastics Industry, Inc. v. OSHA,* 509 F.2d 1301, 1309 (2d Cir. 1975); *Atlantic & Gulf Stevedores, Inc. v. OSHRC,* 534 F.2d 541, 548 (3d Cir. 1976). *See also Chrysler Corp. v. Department of Transportation,* 472 F.2d 659, 671–74 (6th Cir. 1972) (Automobile Safety Act of 1966). Thus, even if Diebold is correct that press brake guarding was generally impossible in 1971, that would not necessarily be incompatible with the correctness of the Commission's view that the Walsh-Healey source required such guarding.

In any event, we do not read the Commission's interpretation as requiring an impossible performance. It is true, as the Secretary has recognized in the past and conceded on this appeal, that there are many situations in which the installation of point of operation guards on press brakes would in fact render the machines unfit for their intended uses. *See OSHA Field In-*formation Memorandum No. 75–46, CCH–ESHG ¶ 9915 (July 17, 1975), *superseded with modifications, OSHA Program Directive No. 100–44,* CCH–ESHG ¶ 10,204 (January 21, 1976) (1975–76 Developments Transfer Binder), *revised, id.* ¶ 10,680 (October 26, 1976) (1977 Developments Transfer Binder). It is implicit in the Commission's decision, however, that § 1910.212 would not, and its Walsh-Healey source did not, require guarding in such cases. Rather, the standard applies only where there exists an identifiable and practical means for guarding the specific machine in the specific uses to which the cited employer puts it. *See, e. g., Production Control Units, Inc.* (OSHRC Docket No. 6976), 15 OSAHRC 617, 2 BNA–OSHC 3294, 1975–76 CCH–OSHD ¶ 20,238 (Ad.L.Judge, 1975).

We believe that this approach places an eminently reasonable limitation on the breadth to which the standard's literal language might otherwise be extended. Further, it comports with the principle that where a standard imposes a duty without specifying the means of compliance, the Secretary has the burden of establishing the existence of a specific and technologically feasible means of compliance as an element of his showing that a violation has occurred. *See General Electric Co. v. OSHRC,* 540 F.2d 67, 70 (2d Cir. 1976); *Ace Sheeting & Repair Co. v. OSHRC,* 555 F.2d 439, 440–41 (5th Cir. 1977); *Irvington Moore, Division of U. S. Natural Resources, Inc. v. OSHRC,* 556 F.2d 431, 433 n. 3 (9th Cir. 1977).[8] Finally, and most importantly, we believe that this construction embodies a reasonable assessment of the intended nature of § 1910.212 (and its Walsh-Healey source) as a general "catch-all" or "gap-filler" intended to impose a point of operation guarding requirement in any case where a hazard exists and guarding is feasible but no other regulation addresses the problem.

---

8. Of course, where the regulation itself specifies the means for compliance, the burden rests on the employer to show the technological impossibility of the specified means. *See, e. g., A. E. Burgess Leather Co. v. OSHRC,* 576 F.2d 948, 952 (1st Cir. 1978); *Ace Sheeting, supra; Brennan v. OSHRC (Underhill Constr. Corp.),* 513 F.2d 1032, 1035 (2d Cir. 1975). *See also I.T.O. Corp. of New England v. OSHRC,* 540 F.2d 543, 546 (1st Cir. 1976) (burden relative to economic nonfeasibility rests on the employer); *Arkansas-Best Freight Systems, Inc. v. OSHRC,* 529 F.2d 649, 654 (8th Cir. 1976) (same).

Diebold claims, however, that there is another regulation which does address press brakes and which in fact exempts them from any point of operation guarding requirements. In the same package of "interim standards" with which the Secretary adopted the general machine guarding requirement from the Walsh-Healey Act regulations, he also promulgated guarding requirements specifically applicable to mechanical power presses. 36 Fed.Reg. 10466, 10643 (May 29, 1971), *codified at* 29 C.F.R. § 1910.217. These requirements were drawn from a "national consensus" source standard originally issued by the American National Standards Institute (hereinafter "ANSI"). Section 1910.217 sets out both a general rule that power press points of operation be guarded and a detailed specification of the acceptable means for achieving that end. 29 C.F.R. § 1910.217(c). In addition, the section states:

> (5) *Excluded machines*. Press brakes * * * are excluded from the requirements of this section.

29 C.F.R. § 1910.217(a)(5).

Diebold argues that the exclusion of press brakes "from the requirements of" § 1910.-217 should be read as an exemption of press brakes from point of operation guarding requirements altogether. Applying the principle that "[i]f a particular standard is specifically applicable * * *, it shall prevail over any different general standard which might otherwise be applicable * *," 29 C.F.R. § 1910.5(c)(1), Diebold contends that in relation to power presses (and therefore press brakes[9]) the general guarding requirements of § 1910.212 are pre-empted by the provisions of § 1910.217 as the standard "specifically applicable" to such machines. Since the latter standard excludes press brakes "from the requirements of this section," and those requirements include point of operation guarding, press brakes are, in Diebold's view, excluded or exempted from the guarding requirements of the sole standard which could properly impose them.

In contrast to Diebold's reading of § 1910.217(a)(5) as an exemption of press brakes from guarding requirements, the Secretary construes the language "excluded from the requirements of this section" as no more than a definition of the power press standard's scope or coverage. Thus, in the Secretary's view, § 1910.217 is "specifically applicable" only to a class of machines composed of all mechanical power presses except press brakes, so that there is no standard "specifically applicable" to press brakes and the general requirements of § 1910.212 can properly be applied.

▮▮▮▮ Given the inartful drafting of § 1910.217(a)(5), neither interpretation can be branded as particularly unreasonable. In this instance, however, the Commission has adopted the Secretary's resolution of the ambiguity, and we are mindful of the great deference which we owe to the Commission's reasonable interpretations of the Secretary's regulations.[10] *Dunlop v. Ashworth, supra; Ron M. Fiegen, Inc., supra.* Our examination of the source standards for §§ 1910.212 and 1910.217 persuades us that the Commission's interpretation is not merely reasonable but probably the most reasonable of the available alternatives.

Thus, the Walsh-Healey source from which the Secretary derived § 1910.212 reads:

> Where existing standards prepared by [designated organizations including ANSI] *provide for point of operation guarding* such standards shall prevail.

**9.** As noted above, it is undisputed that a press brake falls within the general class of machines which the regulations label "power presses."

**10.** Diebold argues that the usual weight which we accord to administrative constructions is inappropriate in relation to § 1910.217 because that standard is an ANSI product and the administrative agencies had no role in its inception. This argument mistakes the nature of our deference to administrative constructions,

which is founded primarily on the special expertise of each agency in its particular field and only secondarily on matters of authorship. *See Brennan v. OSHRC (Republic Creosoting Co.),* 501 F.2d 1196, 1198–99 (7th Cir. 1974); *Brennan v. Gilles & Cotting, Inc.,* 504 F.2d 1255, 1262 (4th Cir. 1974). In any case, the meaning of § 1910.217 is at issue here only insofar as it relates to the scope of § 1910.212, and the Secretary was the author of the Walsh-Healey predecessor to the latter standard.

41 C.F.R. § 50–204.5(c)(2) (1970) (*emphasis added*). That language tends to support, though it hardly compels, the Commission's view that § 1910.212 gives precedence only to those specific standards which, unlike § 1910.217, affirmatively impose a point of operation guarding requirement on the machine in question. In addition, the exclusion language in § 1910.217—which Diebold reads as an exemption and the Commission construed as a definition of the section's scope—appeared under the heading "Scope" in the original ANSI source standard. ANSI B–11.1–1971 ¶ 1.1. Most importantly, as the product of a private organization, ANSI guidelines are dependent for their observance on the voluntary compliance of the affected employers. Because the ANSI predecessor to § 1910.217 was therefore precatory rather than mandatory, we believe it unlikely that its drafters intended to relieve employers from legally enforceable duties imposed by other sources such as the Walsh-Healey predecessor to § 1910.212. *See AFL–CIO v. Brennan, supra,* 530 F.2d at 112.

■ Finally, Diebold argues that, as the Commission recognized, its resolution of the ambiguity in § 1910.217 creates something of an inconsistency in the structure of guarding requirements established by the regulations. Specifically, the Commission has determined that the temporary exclusion of some existing power presses from the guarding requirements of the power press standard does not operate to subject those presses to the immediately effective requirements of § 1910.212 as a generally applicable standard. *Stevens Equipment Co.* (OSHRC Docket No. 1060), 2 OSAHRC 1501, 1 BNA–OSHC 1227, 1971–73 CCH–OSHD ¶ 15,691 (1973). *See* 29 C.F.R. § 1910.217(a)(1)–(3).

The inconsistency of that decision with the Commission's treatment of the press brake exclusion in § 1910.217 may be more apparent than real, since the temporary "exclusion" is really more in the nature of a time-phased inclusion. Assuming, however, that there is an inconsistency, we do not believe it is fatal. After all, it should hardly be surprising that anomalies occur in "the Byzantine pattern of OSHA standards." *General Electric Co., supra,* 540 F.2d at 70 n. 2. Given the wide variety of sources for the initial standards package and the rapidity of its promulgation, we would be frankly surprised if there were not anomalies. *See, e. g., Builders Steel Co. v. Marshall,* 575 F.2d 663, 666 (8th Cir. 1978); *Diamond Roofing Co., supra,* 528 F.2d at 649–50; *Dunlop v. Ashworth, supra,* 538 F.2d at 563. *Cf. AFL–CIO, supra,* 530 F.2d at 115 n. 15. Indeed, a thoroughly integrated and internally consistent initial standards package probably would have required modification of some source standards, thereby raising serious questions as to the validity of their promulgation without benefit of the Act's full rule-making procedures. *See* note 6, *supra.*

### III.

While we are persuaded that the Commission's interpretation of the applicable regulations is correct, that does not lead inexorably to a conclusion that the regulations may be applied in the instant case. Here, as it did before the Commission, Diebold argues that even if the Commission properly construed § 1910.212, the regulation is so vague in its requirements that its enforcement would violate the due process clause of the Fifth Amendment. Within certain limits, we find ourselves in agreement with that contention.

■ Among the myriad applications of the due process clause is the fundamental principle that statutes and regulations which purport to govern conduct must give an adequate warning of what they command or forbid. In our jurisprudence,

> because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.

*Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). The principle applies with special force to statutes which regulate in the area of First Amendment rights, but the due process requirement of fundamental fairness is hardly limited to that context. Even

a regulation which governs purely economic or commercial activities, if its violation can engender penalties, must be so framed as to provide a constitutionally adequate warning to those whose activities are governed. *See Joseph E. Seagram & Sons, Inc. v. Hostetter,* 384 U.S. 35, 48–50, 86 S.Ct. 1254, 16 L.Ed.2d 336 (1966); *Boyce Motor Lines v. United State,* 342 U.S. 337, 340, 72 S.Ct. 329, 96 L.Ed. 367 (1952).

There is no doubt that the violation of § 1910.212 exposed Diebold to penalties. *See* 29 U.S.C. § 666. *See also Brennan v. Winters Battery Mfg. Co.,* 531 F.2d 317, 324–25 (6th Cir. 1975). Our concern, therefore, is with the question whether the regulation gave Diebold sufficient warning that press brakes were within the scope of its point of operation guarding requirements. The question is to be answered, of course, "in the light of the conduct to which [the regulation] is applied." *United States v. National Dairy Products Corp.,* 372 U.S. 29, 36, 83 S.Ct. 594, 600, 9 L.Ed.2d 561 (1963). Moreover, the constitutional adequacy or inadequacy of the warning given must be "measured by common understanding and commercial practice." *United States ex rel. Shott v. Tehan,* 365 F.2d 191, 198 (6th Cir. 1966), *cert. denied,* 385 U.S. 1012, 87 S.Ct. 716, 17 L.Ed.2d 548 (1967). *See also Jordan v. De George,* 341 U.S. 223, 231–32, 71 S.Ct. 703, 95 L.Ed. 886 (1951); *Stout v. Dallman,* 492 F.2d 992, 994 (6th Cir. 1974).

Certainly, if § 1910.212 stood alone, with its meaning (and hence the sufficiency of its warning) evaluated in the abstract, there would be substantially less merit to Diebold's claim. The due process clause does not impose drafting requirements of mathematical precision or impossible specificity. *United States v. Powell,* 423 U.S. 87, 94, 96 S.Ct. 316, 46 L.Ed.2d 228 (1975); *Boyce Motor Lines, supra,* 342 U.S. at 340, 72 S.Ct.

329; *Stout, supra,* 492 F.2d at 994. ·Though the guarding requirement of § 1910.212 is stated quite generally, the generality is a necessary by-product of the broad scope of the subject matter and the nearly infinite variety of machines which might pose hazards of the sort within the rule's coverage. Thus, if our concern here were simply the non-specificity of the regulation, there would be little room for debate.

▬ In the instant case, however, the non-specificity of the general guarding standard is but one in a collection of several factors which we believe operated together to deprive Diebold of a constitutionally sufficient warning. First is the inartful drafting of § 1910.217, the power press guarding standard. As described in § II, *supra,* that regulation is framed in terms which could well lead an employer reasonably to believe that press brakes had been specifically exempted from the generally applicable point of operating guarding requirements. Second is the undisputed "common understanding and commercial practice" relative to press brake guarding. As stated in the Secretary's brief on this appeal, press brake point of operation guarding has been "rarely used" in practice. *Brief for the Secretary of Labor,* Addendum C (at p. 62 of the Addendum). Thus, unless we embrace the untenable assumption that industry has been habitually disregarding a known legal requirement, we must conclude that the average employer has been unaware that the regulations required point of operation guarding. Third is the confirmation of industry practice by the pattern of administrative enforcement: Prior to the Commission's decision in *Irvington Moore,*[11] which was decided after the citations in the instant case, a clear majority of Administrative Law Judges had held § 1910.212 inapplicable to press brakes.[12]

---

11.  *Irvington Moore, Div'n of U. S. Natural Resources, Inc.* (OSHRC Docket No. 3116), 16 OSAHRC 608, 3 BNA–OSHC 1018, 1974–75 CCH–OSHD ¶ 19,523 (1975), *rev'g,* 1973–74 CCH–OSHD ¶ 17,162 (Ad.L.Judge, 1974), *aff'd,* 556 F.2d 431 (9th Cir. 1977).

12.  *See Irvington Moore,* note 11, *supra* (ALJ Kennedy); *Paccar, Inc.* (OSHRC Docket No. 1885), 1973–74 CCH–OSHD ¶ 17,331 (1974)

(ALJ Watkins), *rev'd,* 17 OSAHRC 595, 3 BNA–OSHC 1133, 1974–75 CCH–OSHD ¶ 19,595 (1975); *Collator Corp.* (OSHRC Docket No. 2004), 1973–74 CCH–OSHD ¶ 17,464 (1974) (ALJ Winters), *aff'd on other grounds,* —— OSAHRC ——, 3 BNA–OSHC 2041, 1975–76 CCH–OSHD ¶ 20,446 (1976); *Sheet Metal Specialty Co.* (OSHRC Docket No. 5022), 1973–74 CCH–OSHD ¶ 17,773 (1974) (ALJ Chaplin), *rev'd,* 17 OSAHRC 212, 3 BNA–OSHC 1104, 1974–75

While none of these factors is particularly compelling on its own, their cumulative effect is such that we cannot ignore it. We recognize that the fairness of a regulatory warning is governed by a less stringent standard in the absence of criminal penalties or First Amendment implications. *Smith v. Goguen,* 415 U.S. 566, 573 n. 10, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974); *Papachristou v. City of Jacksonville,* 405 U.S. 156, 162, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972). Further, we are aware that a duty of inquiry may properly be imposed on those engaged in business enterprises, as they should be alert to the probability that their conduct is of interest to one or more administrative agencies. *Id.,* 405 U.S. at 163, 92 S.Ct. 839. But on the undisputed facts of this case, we are unable to see how such a duty of inquiry could have been triggered. Whether an employer looked to the language of the regulations [13] or to industry practice, it would have been led to believe that press brakes had been specifically exempted from guarding requirements. To hold that in those circumstances the employer should have nonetheless been put on notice by a general guarding requirement which was applicable to all machines, and which made no mention of press brakes, would be to indulge a fiction having little relation to reality. "[G]reat caution should be used not to let fiction deny the fair play that can be secured only by a pretty close adhesion to fact." *McDonald v. Mabee,* 243 U.S. 90, 91, 37 S.Ct. 343, 61 L.Ed. 608 (1917). Adhering to the facts here, we believe that the regulations were insufficient to warn employers that guarding of press brakes was required.

Nor are we persuaded by the Secretary's argument that, whatever the adequacy of the warning as to other employers, Diebold must be held to have received notice because it was aware of the guarding requirement prior to issuance of the instant citations. Certainly, if Diebold had been aware of the guarding requirement, it would have received a constitutionally sufficient warning and could have no complaint on that score.

> [O]ne to whom application of a [rule] is constitutional will not be heard to attack the [rule] on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional.

*United States v. Raines,* 362 U.S. 17, 21, 80 S.Ct. 519, 522, 4 L.Ed.2d 524 (1960). There is nothing in the record before us, however, to show that Diebold was so aware. The Commission did not rest its rejection of the due process claim on this ground but relied on its earlier stated view that reasonable men could not be led astray by the unfortunate wording of the press brake standard. *See Irvington Moore,* note 11, *supra.* For the reasons stated above, we disagree with that premise and we are not empowered to substitute a new ground for decision which the Commission itself did not invoke. *S. E. C. v. Chenery Corp.,* 318 U.S. 80, 95, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

Moreover, even if the Commission had found that Diebold was aware of the requirement, we would be hard put to discover substantial evidence in this record upon which to affirm such a finding. *See* 29 U.S.C. § 660(a). The sole evidentiary basis put forward by the Secretary is the

---

CCH–OSHD ¶ 19,546 (1975); *Clark Equipment Co.* (OSHRC Docket No. 7925), 1974–75 CCH–OSHD ¶ 19,399 (1975) (ALJ Worcester), *rev'd,* ——— OSAHRC ———, 3 BNA–OSHC 1834, 1975–76 CCH–OSHD ¶ 20,238 (1975). *Contra: Gem-Top Mfg., Inc.* (OSHRC Docket No. 2795), 1973–74 CCH–OSHD ¶ 17,280 (1974) (ALJ Mitchell), *aff'd,* 16 OSAHRC 591, 3 BNA–OSHC 1022, 1974–75 CCH–OSHD ¶ 19,524 (1975), *aff'd,* 556 F.2d 431 (9th Cir. 1977); *Consolidated Metal Products* (OSHRC Docket No. 3620), 11 OSAHRC 621, 2 BNA–OSHC 3152, 1974–75 CCH–OSHD ¶ 18,474 (1974) (ALJ Donegan); *Production Control Units, Inc.* (OSHRC Docket No. 6976), 15 OSAHRC 617, 2 BNA–OSHC 3294, 1974–75 CCH–OSHD ¶ 19,-193 (1975) (ALJ Burroughs).

**13.** Our conclusion in § II, *supra,* that the Secretary's construction of the regulations is the most reasonable of the available alternatives is premised not on the language of the regulations but on a careful examination of their source standards. We do not believe that the average businessman, or even his attorney (given the thousands of regulations promulgated under the Act), should be held to have conducted a similar examination in the absence of some additional factor warning that the particular regulation might be applicable.

fact that, prior to issuance of the instant citations, Diebold's plant engineers had already been seeking out a workable point of operation guarding device for the Company's press brakes. Considered simply in terms of probative value, an employer's attempts to render machinery or working premises more safe, without anything more, cannot reasonably support an inference that the attempts were made because the employer believed them to be legally required. Further, the drawing of such an inference would be repugnant to the purposes of the Act. Congress expected that safety in the nation's workplaces would be achieved as much by the voluntary efforts of employers as by the enforcement programs of the government. *See Dunlop v. Rockwell International,* 540 F.2d 1283, 1292 (6th Cir. 1976). If employers are not to be dissuaded from taking precautions beyond the minimum regulatory requirements, they must be able to do so without concern that their efforts will later provide the sole evidentiary basis for an adverse finding of the sort urged here. *See Cape and Vineyard Div'n of New Bedford Gas Co. v. OSHRC,* 512 F.2d 1148, 1154 (1st Cir. 1975).

█ We emphasize that our holding as to the insufficiency of the warning given is reached with reference to the particular "facts of the case at hand." *United States v. Mazurie,* 419 U.S. 544, 550, 95 S.Ct. 710, 714, 42 L.Ed.2d 706 (1975).[14] It is axiomatic that defects in the constitutional sufficiency of a regulatory warning may be cured by authoritative judicial or administrative interpretations which clarify obscurities or resolve ambiguities.[15] Once such a construction has been provided, wholly prospective application of the rule thus established does not offend due process since the interpretive decision itself provides the requisite warning. In relation to press brake guarding, the Commission's decision in *Irvington Moore* no doubt filled such a curative function, definitively establishing that the general machine guarding standard applies to press brakes. Thus, the prospective application of this interpretation—whether to Diebold or to other employers—is not affected by our decision.

█ The validity of prospective enforcement of the Commission's interpretation does raise a question as to the precise disposition of the instant proceeding, since the Commission not only fined Diebold for its failure to provide guarding on the days the citations were issued but also ordered the Company to provide such guarding in the future. As to the fines, of course, the lack of a constitutionally sufficient warning precludes enforcement of the Commission's order. As to the requirement of future guarding on the other hand, it is at least arguable that prospective enforcement of the order would be inoffensive to the constitutional guarantee. *Cf. F. T. C. v. Ruberoid Co.,* 343 U.S. 470, 483–94, 72 S.Ct. 800, 96 L.Ed. 1081 (1952) (Jackson, J. dissenting); Note, *The Void-for-Vagueness Doctrine in the Supreme Court,* 109 U.Pa.L. Rev. 67, 77 n. 55 (1960). However, while we recognize that there are probably cases in which an order such as the present one could properly be treated as severable,[16]

---

**14.** In this regard, we note that somewhat similar due process claims regarding press brake guarding were raised and rejected in *Irvington Moore, Div'n of U. S. Natural Resources, Inc. v. OSHRC,* 556 F.2d 431 (9th Cir. 1977), and *Long Manufacturing Co. v. OSHRC,* 554 F.2d 903 (8th Cir. 1977). Our conclusion is not at odds with those decisions, however. In *Long,* the employer had actual knowledge of the regulatory requirement prior to the citations under review. 554 F.2d at 905–906. Similarly, in *Irvington Moore,* the employer's claims of having been misled were rejected by the court (with one judge concurring and one judge dissenting) as "not credible." 556 F.2d at 435. Here, by contrast, there is nothing of record to indicate Diebold's actual knowledge that guarding was required.

**15.** *Rose v. Locke,* 423 U.S. 48, 52, 96 S.Ct. 243, 46 L.Ed.2d 185 (1975); *Parker v. Levy,* 417 U.S. 733, 752–54, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); *Smith v. Goguen,* 415 U.S. 566, 575, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974); *Wainwright v. Stone,* 414 U.S. 21, 22–23, 94 S.Ct. 190, 38 L.Ed.2d 179 (1973); *Jackson v. Dorrier,* 424 F.2d 213, 217–18 (6th Cir.), *cert. denied,* 400 U.S. 850, 91 S.Ct. 55, 27 L.Ed.2d 88 (1970).

**16.** The Act itself distinguishes between citations for past violations and proceedings following the employer's failure to correct violations once it has been cited. *Compare* 29 U.S.C. §§ 659(a) and 666(b) and (c) with *id.* §§ 659(b) and 666(d). *See Marshall v. B. W. Harrison Lumber Co.,* 569 F.2d 1303 (5th Cir. 1978).

with enforcement denied on due process grounds only in relation to the penalties for past conduct, we do not believe that this is such a case.

Before the Commission, Diebold relied in large part on its contention that the required guarding of its press brakes was technologically impossible. Both the Commission and the courts have habitually looked on such claims with a jaundiced eye when they have been raised for the first time in enforcement proceedings by employers who made no prior effort to seek either a variance, 29 U.S.C. § 655(d), or a modification of the applicable standard, *id.* § 655(c).[17] Indeed, in the instant case, one of the two Commissioners constituting the majority was of the view that Diebold's claim could not be addressed on its merits because of the Company's failure to "exhaust" these preliminary administrative remedies.[18] Whether such exhaustion is required or is merely to be preferred, the fact remains that an employer which has not previously sought a variance or modification starts with a distinct disadvantage when it claims impossibility in an enforcement proceeding.

In the instant case, the Commission's order that Diebold provide press brake guarding in the future necessarily rests on the Commission's rejection of the claim that such guarding is impossible, a holding which was substantially affected (indeed, as to half the Commission majority, was determined) by Diebold's failure to seek a variance. But Diebold's failure to seek a variance is directly attributable in turn to the insufficiency of the warning given by the regulations: Plainly, an employer has no reason to seek relief from a regulatory requirement unless it is first on notice that the requirement exists. Thus, even if we limited enforcement of the Commission's order to its prospective elements, we would nonetheless be enforcing an obligation which very well might not have been imposed had Diebold received a fair opportunity to seek a variance and, if unsuccessful in that quest, had it then been able to proceed without the procedural disadvantages visited on those who sidestep their variance opportunities.

Because the lack of a constitutionally sufficient warning thus affected the whole of the Commission's decision and order, we are unable to regard the prospective elements of the order as severable from the penalties. Rather, the only way by which to give Diebold the full benefit of the notice denied by the regulations is to vacate the order in its entirety.

## IV.

For the foregoing reasons, the decision of the Commission is reversed, the order of the Commission is vacated, and the underlying citations are dismissed. No costs are taxed; each party will bear its own costs on this appeal.

17. *See, e. g., Atlantic & Gulf Stevedores, Inc. v. OSHRC,* 534 F.2d 541, 548–51, 555–56 (3d Cir. 1976); *Arkansas-Best Freight Systems, Inc. v. OSHRC,* 529 F.2d 649, 653 (8th Cir. 1976); *Deemer Steel Casting Co.* (OSHRC Docket No. 2792), 15 OSAHRC 162, 2 BNA–OSHC 1577, 1974–75 CCH–OSHD ¶ 19,221 (1975). *See also General Electric Co. v. Secretary of Labor,* 576 F.2d 558, 560–62 (3d Cir. 1978); *Irwin Steel Erectors v. OSHRC,* 574 F.2d 222, 223 (5th Cir. 1978).

18. Though the matter is not entirely clear, it appears that the other majority Commissioner may have viewed the failure to exhaust as shifting the burden of proof as to impossibility, *see* text and note at n. 8, *supra,* or as altering the standard of proof. Of course, given the limited scope of judicial review available under the Act, the Commission's treatment of burdens and standards of proof will often be determinative of the employer's rights.