617 F.2d 497
 8 O.S.H. Cas.(BNA) 1110, 1980 O.S.H.D. (CCH) P 24,318
WESTINGHOUSE ELECTRIC CORPORATION, Petitioner,
v.
OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION and
Secretary of Labor, Respondents.
 No. 79-1556.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 17, 1980.
Decided March 25, 1980.
 
 Ronald G. Ingham, Humphreys, Hutcheson & Moseley, Chattanooga, Tenn., for petitioner.
 Laura V. Fargas, U. S. Dept. of Labor, Washington, D.C., for respondents.
 Before TONE, WOOD and CUDAHY, Circuit Judges.
 PER CURIAM.
 
 
 1
 The issue in this case is the interpretation to be given two related standards regulating spray-finishing operations promulgated under the Occupational Safety and Health Act of 1970.[1] The two standards are 29 C.F.R. § 1910.94(c) and 29 C.F.R. § 1910.107.[2]
 
 
 2
 Westinghouse Electric Corporation was cited by the Occupational Safety and Health Administration for an alleged non-serious violation of 29 C.F.R. § 1910.94(c)(2) as a result of an inspection on June 6, 1975 of its Muncie, Indiana, large transformer plant.[3]
 
 
 3
 There is no substantial dispute about the facts. Just prior to shipment the large transformers manufactured at Muncie are painted by four painters on three shifts using electrostatic paint spray equipment.[4] In 1975, 134 transformers were painted and shipped. The painting of each transformer entails approximately 44 minutes. Following an employee complaint, an OSHA Compliance Officer inspected the Westinghouse premises and upon concluding that the painting was not confined to a spray booth or spray room the citation was issued,[5] but without an actual observation of the painting operation, or sampling the air for contaminates or inquiry as to the nature of the paint material being used.
 
 
 4
 The issue was joined before the administrative law judge. The position taken by the Secretary of Labor was that no proof of harmful or hazardous conditions was necessary to show a violation as the spraying operation in any event was required under 29 C.F.R. § 1910.94(c)(2) to be conducted either in a spray booth or a spray room, and it was not. At that point Westinghouse did not argue that the painting was not done in a spray room or spray booth, but did dispute that either type room was necessary unless it was first established that the spraying caused dangerous or hazardous conditions under 29 C.F.R. § 1910.107(a)(2).
 
 
 5
 Since the circumstances closely paralleled the situation in Secretary of Labor v. Bethlehem Fabricators, Inc., OSHRC Docket No. 7176, (1976-1977) O.S.H. Dec. (CCH) P 20,782 (June 11, 1976), published after the Westinghouse citation was issued, the administrative law judge relied on Bethlehem. He held that Section 1910.94(c) should not be considered in isolation but should be examined in relation to other standards on the same subject and in particular Section 1910.107(a)(2). It was incumbent, he held, on the Secretary when combustible materials were used, as in this case, to satisfy the requirements of Section 1910.107(a)(2). That section defines a spraying area as any area in which dangerous quantities of flammable vapors or mist, or combustible residues, dusts, or deposits are present due to the operation of the spraying process. Since the Secretary's evidence had not shown that there were hazards or dangers to the employees, the administrative law judge found that the company was not in violation of 29 C.F.R. § 1910.94(c)(2) requiring a spray booth or a spray room.
 
 
 6
 When the decision of the administrative law judge was reviewed by the full Commission, Bethlehem was overruled.[6] This time the Commission held that in spite of many cross references between Section 1910.94 and Section 1910.107, the standards need not be read in conjunction. The Commission relied upon what it perceived to be the plain reading of Section 1910.94(c)(2) which by its terms requires that all spray-finishing operations be enclosed or confined in a spray room or spray booth regardless of whether hazards exist or not, with an exception not applicable here. That view of the relationship of the two standards is sought to be justified by a discussion of the origin and adoption of the two sections derived from different sources. The Commission majority concludes that the drafters intended that all spray-finishing operations be enclosed or confined.[7] It is the Commission's conclusion that 1910.94(c) (2) and 1910.107 are addressed to different hazards and working conditions. Therefore it finds that Section 1910.94(c)(2) regulates the use of spray booths or spray rooms for all spray-finishing operations, whereas 1910.107 provides ventilation requirements for those operations otherwise governed by 1910.94(c) which employ flammable or combustible materials.
 
 
 7
 In dissent, Commissioner Baranko argues that the two standards cannot be so neatly divided, as he finds it obvious that the two standards are not only directed toward different hazards but also to similar aspects of the same hazard. He further argues that it cannot be shown that 1910.107 is directed only to fire hazards, as 1910.94(c) also has provisions directed toward fire hazards. Commissioner Baranko departed from his majority view in Bethlehem as he now agrees that the Secretary need not establish that dangerous quantities of emissions are produced by spray paint operations before a spray booth or spray room is required under 1910.94(c)(2). However, Commissioner Baranko does not agree that 1910.94(c) and 1910.107 are directed to entirely different hazards and working conditions and that the existence of hazards is totally irrelevant in determining whether 1910.94(c)(2) has been violated. Therefore, he argues that in order to establish a violation of 1910.94(c)(2) the Secretary must show precisely in what respect the spray painting operation was deficient.
 
 
 8
 Further, Commissioner Baranko disputes that the evidence showed that Westinghouse was not using a spray room as distinguished from a spray booth. A spray room "is a room in which spray-finishing operations not conducted in a spray booth are performed separately from other areas"[8] (emphasis supplied). The standard does not specify what "separately" means in terms of distance or other conditions. Therefore, Commissioner Baranko argues that the Secretary failed to establish that the spraying was not performed separately from other areas in the room because if sufficiently separated it would qualify as a spray room. He then concludes that since Westinghouse was not shown to be in violation of the definitional requirement of a spray room, a violation could result only from a violation of a design or mechanical specification for a spray room, which he finds not to exist in the record.
 
 
 9
 In coming to our own conclusion in this case, we shall not endeavor to pursue all the arguments on both sides. It is obvious that the two standards are not easily intelligible to those subject to them, to those who administer them, or to those of us who try to determine what they mean. It is not our task to rewrite the standards. We do regret, however, that the thought of rewriting the standards apparently has not occurred to the Secretary. Recognizing that the purpose of the standards is to protect the health and safety of employees, although confusingly attempted, we attempt a rational resolution of the problem.
 
 
 10
 As in Diebold, Inc. v. Marshall, 585 F.2d 1327, 1334 (6th Cir. 1978), given the "inartful drafting" of the two sections "neither interpretation can be branded as particularly unreasonable." Since some of the ambiguities resulting from deficient drafting will remain in spite of our decision, rewriting by the Secretary will remain worthy of consideration. Rewriting would be expected to avoid the Commission's own shifting interpretation as well as likely divergent views arising in the various circuits. We are mindful of the great deference we owe to the Commission's reasonable interpretation of the Secretary's regulations, at least under ordinary circumstances. That deference is dubiously bestowed, however, when the Commission's view taken of the tangle between the two sections is reversed within a short period of time seemingly with the change of a single commissioner, and each of the Commission's decisions has prompted a dissent.
 
 
 11
 No one claims that Westinghouse had even an inadequate "spray booth." The definition of a spray booth is set forth at 29 C.F.R. § 1910.107(a)(3) and is incorporated by reference at 29 C.F.R. § 1910.94(c)(ii), and provides:
 
 
 12
 Spray booth. A power-ventilated structure provided to enclose or accommodate a spraying operation to confine and limit the escape of spray, vapor, and residue, and to safely conduct or direct them to an exhaust system.
 
 
 13
 However, the Commission majority does not hold that the spray painting must be in a spray booth. It appears a spray room will also satisfy the requirements. A "spray room" is defined under applicable definitions in Section 1910.94(c) (iii) as follows:
 
 
 14
 A spray room is a room in which spray-finishing operations not conducted in a spray booth are performed separately from other areas.
 
 
 15
 Following, however, in Section 1910.94(c)(2), titled "Location and application," and also in Section 1910.94(c)(8), titled "Scope," appears language suggesting what may be additional or different requirements.
 
 
 16
 Spray booths or spray rooms are to be used to enclose or confine all operations. (Emphasis added.)
 
 
 17
 Being performed "separately from other areas" as required in the spray room definition section suggests a different interpretation than being "enclosed," one of the terms used in the "Location and application" and "Scope" sections. The other term used is "confined." The words "enclosed or confined," even if those terms are to be read into the definitions, are used disjunctively. It appears that either to be enclosed or to be confined will suffice. That the two terms refer to different means of limiting the spraying operation is suggested by the ordinary meaning of the terms and the use of the disjunctive "or." We interpret enclosed to suggest being "fenced in," but confined to suggest being kept within limits. Perhaps a mere space separation might serve to confine the spray painting within certain limits in relation to any other activities in the same room and thereby qualify as a spray room. Distance alone, however, would not be enough to qualify as enclosed in a spray booth.
 
 
 18
 It is also reasonable to infer that the use of the word "room" is intended to signify something different than the word "booth." As used, the word "room" suggests that activities other than spray painting may be in the same general room provided the spray painting is sufficiently separated from any other activities so that the spray painting causes no interference. The regulations require that both spray rooms and spray booths be ventilated. It is less likely that it was contemplated that a booth could have activities other than paint spraying present in the booth. A booth suggests that it is to be exclusively for spray painting.
 
 
 19
 The Commission majority opinion concludes that since the spray painting was not enclosed or confined by a spray booth or spray room the violation is established. The Commission majority opinion notes, however, that other production activities "took place as close as five feet from the spray finishing." In a footnote to the majority conclusion it is stated that a spray room is a room where spray painting is conducted with adequate physical separation from other areas as contrasted with spray booths which are physically enclosed structures made of steel or concrete, etc., and removed at least three feet from other operations. There is the additional footnote comment that there is no indication that spray rooms may be separated from other areas by as little as three feet. We believe that to some extent there may be some common ground for reconciling the differences between the Commission majority and the dissent as to the requirements. It is possible to read the majority opinion as grounding the alleged violation on the close proximity of the spray painting to other activities in the same room, and not on the absence of a physical partition between the two. If so, then there is no definition disagreement between us. If a steel and concrete barrier is not required as provided in 1910.107(b) for the construction of a spray booth, and we find no similar construction requirements for a spray room, perhaps, the separation can be achieved, for example, by the use of only a sliding fireproof curtain to be closed during painting so as to qualify as a spray room in the particular circumstances. How spray room separation may be achieved is a matter for the expertise of the agency. It seems to us that costly structural modification should not be required unless a reasonable need can be demonstrated.
 
 
 20
 The evidence offered by the Secretary as to the particular conditions found to exist near the paint spraying was characterized by the Secretary's own counsel as only a "crude" test. To determine the amount of overspray metal tags were placed on the floor from 10 up to 30 feet from the generators being sprayed. Some overspray was demonstrated. However, Westinghouse used a more sophisticated test which included a test of airborne matter and vapors. That test demonstrated that the operation was within the limits for employee exposure to air contaminants.[9] The record was not developed for the purpose and is not sufficient to support a determination of whether or not the location of the Westinghouse spray painting is sufficiently separated from other activities in the particular circumstances so as to qualify as being conducted in a spray room.[10]
 
 
 21
 We find no merit to the other arguments of Westinghouse alleging a due process violation or that it is entitled to the "small portable spraying apparatus" exemption contained in 29 C.F.R. § 1910.94(c)(8).
 
 
 22
 The order of the Commission is vacated and the case is remanded for further proceedings consistent with this opinion to determine whether or not the spray painting is being conducted in a spray room.[11] Each party shall bear its own costs.
 
 
 
 [1]
 29 U.S.C. § 651 et seq
 
 
 [2]
 In pertinent part the two regulations are:
 § 1910.94 Ventilation.
 (c) Spray finishing operations (1) Definitions applicable to this paragraph (i) Spray-finishing operations. Spray-finishing operations are employment of methods wherein organic or inorganic materials are utilized in dispersed form for deposit on surfaces to be coated, treated, or cleaned. Such methods of deposit may involve either automatic, manual, or electrostatic deposition but do not include metal spraying or metallizing, dipping, flow coating, roller coating, tumbling, centrifuging, or spray washing and degreasing as conducted in self-contained washing and degreasing machines or systems.
 (ii) Spray booth. Spray booths are defined and described in § 1910.107(a). (See sections 103, 104, and 105 of the Standard for Spray Finishing Using Flammable and Combustible Materials, NFPA No. 33-1969.)
 (iii) Spray room. A spray room is a room in which spray-finishing operations not conducted in a spray booth are performed separately from other areas.
 (2) Location and application. Spray booths or spray rooms are to be used to enclose or confine all operations. Spray-finishing operations shall be located as provided in sections 201 through 206 of . . . NFPA No. 33-1969.
 (3) Design and construction of spray booths. (i) Spray booths shall be designed and constructed in accordance with § 1910.107(b)(1)-(4) and (6)-(10) (see sections 301-304 and 306-310 of . . . NFPA No. 33-1969), for general construction specifications. For a more detailed discussion of fundamentals relating to this subject, see ANSI Z9.2-1960.
 (a) Lights, motors, electrical equipment, and other sources of ignition shall conform to the requirements of § 1910.107(b)(10) and (c). (See section 310 and chapter 4 of . . . NFPA No. 33-1969.)
 (iii) Baffles, distribution plates, and dry-type overspray collectors shall conform to the requirements of § 1910.107(b)(4) and (5). (See sections 304 and 305 of . . . NFPA No. 33-1969.)
 (a) Overspray filters shall be installed and maintained in accordance with the requirements of § 1910.107(b)(5), (see section 305 of . . . NFPA No. 33-1969) . . ..
 (5) Ventilation. (i) Ventilation shall be provided in accordance with provisions of § 1910.107(d) (see chapter 5 of . . . NFPA No. 33-1969) . . ..
 (8) Scope. Spray booths or spray rooms are to be used to enclose or confine all spray finishing operations covered by this paragraph (c). This paragraph does not apply to the spraying of the exteriors of buildings, fixed tanks, or similar structures, nor to small portable spraying apparatus not used repeatedly in the same location.
 § 1910.107 Spray finishing using flammable and combustible materials.
 (a) Definitions applicable to this section
 (2) Spraying area. Any area in which dangerous quantities of flammable vapors or mists or combustible residues, dusts, or deposits are present due to the operation of spraying processes.
 (3) Spray booth. A power-ventilated structure provided to enclose or accommodate a spraying operation to confine and limit the escape of spray, vapor, and residue, and to safely conduct or direct them to an exhaust system.
 (b) Spray booths (1) Construction.
 (2) Interiors.
 (3) Floors.
 (4) Distribution or baffle plates.
 (5) Dry type overspray collectors (exhaust air filters ).
 (6) Frontal area.
 (7) Conveyors.
 (8) Separation of operations.
 (9) Cleaning.
 (10) Illumination.
 (c) Electrical and other sources of ignition
 (d) Ventilation
 (i) Electrostatic handspraying equipment
 (9) Ventilation. The spraying operation shall take place within a spray area which is adequately ventilated to remove solvent vapors released from the operation.
 (n) Scope This section applies to flammable and combustible finishing materials when applied as a spray by compressed air, "airless" or "hydraulic atomization," steam, electrostatic methods, or by any other means in continuous or intermittent processes. . . . The section does not apply to outdoor spray application of buildings, tanks, or other similar structures, nor to small portable spraying apparatus not used repeatedly in the same location.
 
 
 [3]
 The only alleged violation involved in this appeal and the date for its correction was worded in the citation as follows:
 
 
 [1]
 29 CFR 1910.94(c)(2) Failure to confine flammable or combustible spray finishing operations to an approved type spray room or booth. Located in Department A-30. Refers to large transformers. December 15, 1975
 
 
 [4]
 This type spraying equipment was purchased and used by Westinghouse as a result of an earlier OSHA citation, the use of which OSHA advised would fully abate the problem
 
 
 [5]
 No penalty was assessed
 
 
 [6]
 When the Commission decided Bethlehem the Commissioners were Baranko, Chairman; Moran and Cleary, Commissioners. Chairman Baranko wrote the majority opinion and Cleary dissented. In 1979 when the Commission, in the present case, overruled its holding in Bethlehem, the Commissioners were the same except Cottine had replaced Moran and Cleary had become Chairman. This time Chairman Cleary wrote the majority opinion and former Chairman Baranko dissented although he modified his original view to some extent. Westinghouse complains that the overruling of Bethlehem resulted merely from a replacement of one Commissioner which causes instability in the Commission's precedent to the detriment of industry
 
 
 [7]
 Westinghouse complains that the record is deficient in evidence supporting the Commission's finding of "intent." We agree
 
 
 [8]
 29 C.F.R. § 1910.94(c)(iii)
 
 
 [9]
 29 C.F.R. § 1910.1000
 
 
 [10]
 As the Commission majority suggests in a footnote, Westinghouse may seek a variance from the Secretary under Section 6(d) of the Act if its employees can be afforded an adequate degree of protection by other means. What those means might be we have no way of knowing. Since Westinghouse had complied with the prior painting citation and was obviously taken by surprise by the overruling of Bethlehem, a waiver, provided employee protection is safeguarded, may be an appropriate remedy to consider although a waiver has not been previously sought by the company
 
 
 [11]
 The court acknowledges the assistance of American Institute of Steel Construction, Inc., as amicus curiae