**HALLIBURTON ENERGY SERVICES,**
Appellant and Cross–Appellee,

v.

**STATE** of Alaska, **DEPARTMENT OF LABOR,** Division of Labor Standards and Safety, Occupational Safety and Health Section, Appellee and Cross–Appellant.

Nos. S–8453, S–8473.

Supreme Court of Alaska.

April 7, 2000.

Michael C. Geraghty and Sarah Diemer Moyer, DeLisio, Moran, Geraghty & Zobel, Anchorage, for Appellant/Cross–Appellee.

Toby N. Steinberger, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee/Cross–Appellant.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

## OPINION

BRYNER, Justice.

### I. INTRODUCTION

A worker assembling a perforation gun at the Halliburton Energy Services plant in Kenai, Alaska, accidentally triggered a fatal explosion. The Alaska Department of Labor fined Halliburton for violating process safety management standards, finding these standards applicable because assembling perforation guns qualifies as manufacturing explosives. But the superior court reversed, ruling that the department could only enforce the safety standards prospectively, since their application to perforation gun assembly had previously been uncertain.

On appeal, Halliburton claims that the standards do not apply at all, even prospectively, because assembling perforation guns

is not the manufacture of explosives, but falls instead within a regulatory exemption for "oil well servicing activities." Alternatively, it argues that the safety regulations are unenforceable because they are unconstitutionally vague. On cross-appeal, the state urges us to affirm the originally imposed fine, arguing that the safety standards unambiguously cover perforation gun assembly and that Halliburton had ample notice of their application. We agree that the standards apply and are sufficiently clear to withstand constitutional challenge. We thus affirm the department's order.

## II. *FACTS AND PROCEEDINGS*

On April 2, 1994, a large explosion at Halliburton's Kenai facility killed Craig Bowen, a part-time Halliburton employee, and injured five others. At the time of the explosion the six employees were assembling perforation guns—devices used to crack oil well casings and thus enhance oil flow. A perforation gun consists of two cylinders with a pattern of holes in each. To assemble the devices, Halliburton employees would fit explosive charges into the holes in the inner cylinder, or charge holder, and align the charge with the holds of the larger outer gun carrier. Each charge rests against an inner detonator cord that runs through a tube centered in the charge holder and protrudes from an end plate. Halliburton would custom manufacture these guns for oil companies in its Kenai facility and then transport them to the customer's well site, where Halliburton employees would supervise the process of sending the guns downhole and exploding them.

The April 2 accident occurred while employee Bowen was trying to align the holes of a charge holder with those of a gun carrier. The accident investigation established that Bowen was probably using the common, although non-standard, Halliburton method of maneuvering the charge holder by pushing on it with the butt end of a pipe wrench. Bowen may have caused the explosion by accidentally striking the detonator cord on the top of the charge holder with the wrench.

The Alaska Department of Labor investigated the accident and ultimately cited and fined Halliburton $1,650 for violating occupational health and safety codes. Among other infractions, the department found that Halliburton had violated state process safety management standards. The department determined that assembling perforation guns amounted to the manufacture of explosives and that the Alaska Explosives Code required Halliburton to comply with the process safety management standards.

After Halliburton contested the citation, the department filed a formal complaint against the company with the state Occupational Safety and Health Review Board ("the board"). Halliburton moved to dismiss, arguing that its operations in Kenai were exempt from the state's process safety management standards, that the Alaska process safety management regulation only applies to operations using certain hazardous chemicals, that assembling perforation guns is not "the manufacture of explosives," and that, in any event, the process of assembling perforation guns falls within the process safety management regulation's exemption for "oil well servicing." The board denied Halliburton's motion.

At a subsequent hearing, Halliburton renewed these arguments and also maintained that the process safety management regulation was vague and failed to give Halliburton adequate notice that the process safety management standards applied to its Kenai operations. The board concluded that the regulation did apply to Halliburton's Kenai operations, affirming the citation and penalty.

Halliburton appealed this ruling to the superior court. The court upheld the board's conclusion that the process safety management standards apply to Halliburton's Kenai facility but concluded that the process safety management regulation was too vague to enforce retroactively. The court thus reversed the board's decision as to the challenged penalty. At the same time, the court ruled that the board's decision gave Halliburton adequate notice that the process safety management standards will apply prospectively to its Kenai operations.

Halliburton appeals the court's finding that the process safety management standards

can be prospectively applied to its manufacture of perforation guns. The state cross-appeals the court's conclusion that the process safety management standard was too vague to apply retroactively.

## III. DISCUSSION[1]

### A. The Legal Context: Occupational Safety and Health Regulation

■ The federal Occupational Safety and Health Act[2] (OSHA) provides that a state may implement its own occupational safety and health program upon approval by the United States Department of Labor.[3] State standards must be "at least as effective" as federal standards.[4] Alaska has an approved OSHA program.[5]

Under the federal OSHA regulation, 29 C.F.R. § 1910.119 (1999) ("PSM regulation"), certain employers must implement a process safety management program.[6] Among other things, the process safety management regulation requires covered employers to thoroughly evaluate the safety of their processes and to train employees in safe procedures. Before the Kenai explosion occurred, Alaska had adopted the federal process safety management standards by reference.[7]

The federal standards apply to processes involving certain chemicals at specified threshold levels.[8] A separate federal regulation, 29 C.F.R. § 1910.109(k)(2) (the "explosives regulation"), provides that the manufacture of certain explosives is also subject to process safety management standards.[9]

---

1. The superior court acted as an intermediate court of appeal when it reviewed the board's decision. Therefore, this court does not defer to the superior court but instead reviews the administrative decision de novo. See University of Alaska v. University of Alaska Classified Employees Ass'n, 952 P.2d 1182, 1184 n. 6 (Alaska 1998) (citation omitted). This court applies the substitution of judgment standard. See Konecky v. Camco Wireline, Inc., 920 P.2d 277, 280 & n. 8 (Alaska 1996) (citation omitted).

2. 29 U.S.C. §§ 651 et seq. (1976).

3. Id. § 667.

4. Id. § 667(c)(2).

5. 29 C.F.R. § 1952.240 (1999).

6. 29 C.F.R. § 1910.119 provides in relevant part:

This section contains requirements for preventing or minimizing the consequences of catastrophic releases of toxic, reactive, flammable, or explosive chemicals. These releases may result in toxic, fire or explosion hazards.
. . . .
This section does not apply to:
(i) Retail facilities;
(ii) Oil or gas well drilling or servicing operations; or
(iii) Normally unoccupied remote facilities.
. . . .
(c) Employee participation. (1) Employers shall develop a written plan of action regarding the implementation of the employee participation required by this paragraph. . . .
. . . .
(d) Process safety information. In accordance with the schedule set forth in paragraph (e)(1) of this section, the employer shall complete a compilation of written process safety information before conducting any process hazard analysis required by the standard. . . .
. . . .
(e) Process hazard analysis. (1) The employer shall perform an initial process hazard analysis (hazard evaluation) on processes covered by this standard. . . .
. . . .
(f) Operating procedures. (1) The employer shall develop and implement written operating procedures that provide clear instructions for safely conducting activities involved in each covered process consistent with the process safety information. . . .
. . . .
(g) Training. (1) Initial training. (i) Each employee presently involved in operating a process, and each employee before being involved in operating a newly assigned process, shall be trained in an overview of the process and in the operating procedures as specified in paragraph (f) of this section. The training shall include emphasis on the specific safety and health hazards, emergency operations including shutdown, and safe work practices applicable to the employee's job tasks.

7. See 8 Alaska Administrative Code (AAC) 61.010, subch. 18 (1994). Subchapter 18 was repealed on December 6, 1995, when 8 AAC 61.010 was repealed.

8. See 29 C.F.R. § 1910.119.

9. See 29 C.F.R. § 1910.109(k)(2) (1999); see also 57 Fed.Reg. 6356, 6368 (Feb. 24, 1992) (noting that the manufacture of explosives poses significant dangers to employees).
29 C.F.R. § 1910.109(k) provides in relevant part:
(1) This section applies to the manufacture, keeping, having, storage, sale, transportation, and use of explosives, blasting agents, and py-

This regulation defines explosives as "any chemical compound, mixture or device, the primary and common purpose of which is to function by explosion."[10] Like the federal law, the Alaska Explosive Code required manufacturers of certain explosives to meet the process safety management standards[11] and defined "explosives" to include "explosive devices ... the primary or common purpose of which is to function by explosion."[12] [Ae. Br. 7–8; Exc. 352]

B. *The Process Safety Management Regulation, 29 C.F.R. § 1910.119, Applies to Halliburton's Assembly of Perforation Guns.*

1. *The process safety management regulation applies to all manufacturers of explosives.*

■ Halliburton argues that the process safety management regulation, 29 C.F.R. § 1910.119, does not apply to its assembly of perforation guns because the language of the regulation expressly limits its application to operations using certain toxic chemicals or large quantities of flammable liquid or gas. But while the process safety management regulation itself does not apply directly to Halliburton's operations, the federal explosives regulation incorporates it by reference.[13]

The Federal Register discussion accompanying the final version of the process safety management regulation reveals OSHA's clear intention to require that the manufacture of explosives comply with process safety management standards:

OSHA remains convinced that the hazards associated with the manufacture of explosives and pyrotechnics have the potential of resulting in a catastrophic incident, and pose a significant risk to employees and that the manufacture of explosives and pyrotechnics should be covered by the provisions of the final process safety management rule.

However, the Agency has been persuaded by those participants who suggested that OSHA delete the manufacture of explosives and pyrotechnics from proposed § 1910.119, and incorporate the provisions of the process safety management standard into 29 CFR 1910.109, "Explosives and Blasting Agents." This will have the effect of referencing in one place, the specific and significant OSHA requirements pertaining to explosives and blasting agents.[14]

The official summary to the final process safety management regulation also indicates that "[t]his rule is being referenced in OSHA's Explosives and Blasting Agents

---

rotechnics. The section does not apply to the sale and use (public display) of pyrotechnics, commonly known as fireworks, nor the use of explosives in the form prescribed by the official U.S. Pharmacopeia.
(2) The manufacture of explosives as defined in paragraph (a)(3) of this section shall also meet the requirements contained in § 1910.119.

**10.** 29 C.F.R. § 1910.109(a)(3) defines "explosive" as follows:

Explosive—any chemical compound, mixture, or device, the primary or common purpose of which is to function by explosion, i.e., with substantially instantaneous release of gas and heat, unless such compound, mixture, or device is otherwise specifically classified by the U.S. Department of Transportation; ... The term "explosives" shall include all material which is classified as Class A, Class B, and Class C explosives by the U.S. Department of Transportation, and includes, but is not limited to dynamite, black powder, pellet powders,

initiating explosives, blasting caps, electric blasting caps, safety fuse, fuse lighters, fuse igniters, squibs, cordeau detonant fuse, instantaneous fuse, igniter cord, igniters, small arms ammunition, small arms ammunition primers, smokeless propellant, cartridges for propellant-actuated power devices, and cartridges for industrial guns. Commercial explosives are those explosives which are intended to be used in commercial or industrial operations.

**11.** *See* 8 AAC 61.010, subch. 9, § 09.110(a)(2) (1994). Subchapter 9 was repealed on December 6, 1995, when 8 AAC 61.010 was repealed. The current regulation adopts federal OSHA standards by reference, except where state standards are stricter. *See* 8 AAC 61.1010–61.1190.

**12.** 8 AAC 61.010, subch. 9, § 09.120(a)(23) (1994).

**13.** *See* 29 C.F.R. § 1910.109(k)(2).

**14.** 57 Fed.Reg. at 6368–69.

standard, 29 CFR [§ ] 1910.109."[15] Thus, by incorporating the process safety management regulation, the explosives regulation would apply the process safety management requirement to Halliburton if Halliburton "manufacture[d] explosives."[16]

### 2. *Halliburton "manufactures" perforation guns.*

Halliburton argues that it does not "manufacture" the perforation guns within the meaning of the explosives regulation, but instead merely " 'assembl[es]' the guns' component parts." Halliburton attempts to distinguish a perforation gun from other "manufactured" products because the gun's components are "fitted" together by hand: workers place charges into a gun's scalloped holes and slide the charge holder into a gun carrier. Halliburton notes that the process does not involve welding, shaping, or fastening nuts and bolts—procedures involved in "manufacturing" a car, for example. It analogizes the process to a photographer loading a camera with film, referring to the process as "gun-loading."

The board rejected Halliburton's definition of "manufacture," relying on the *Standard Industrial Classification Manual*'s[17] statement that "[e]stablishments engaged in assembling component parts of manufactured products are also considered manufacturing if the new product is neither a structure nor other fixed improvement." The board also noted that federal OSHA officials interpret "manufacturing" of explosives to include "assembly" of a perforation gun's component parts.

We agree with the board. Halliburton's definition of "manufacture" is strained and impractically narrow. We agree with OSHA's position that "manufacture" includes "assembly."[18]

### 3. *Perforation guns are "explosives."*

Having determined that Halliburton "manufactures" perforation guns, we must next decide whether perforation guns are explosives. The explosives regulation defines an "explosive" as "[a] device, the primary or common purpose of which is to function by explosion."[19] Halliburton argues that the relevant "explosive" for purposes of the regulation is not the perforation gun itself, but the explosive charges that are manufactured by a third party. But Halliburton's argument ignores the possibility that the regulatory definition of explosives includes both the charge and the gun itself, as the gun is also a "device [intended primarily to] function by explosion."[20] As Halliburton's process safety management consultant conceded at trial, the perforation guns are "intended to explode."

The fact that the definition of "explosive" in the explosives regulation explicitly includes "cartridges" for guns but not guns themselves is not dispositive.[21] The regulation's list is not exclusive.[22] It lists only items that are explosive materials themselves—dynamite, powder, charges, fuses, cords, and ammunition—omitting the devices that contain such materials but do not themselves explode. But the loading of explosives is an integral part of the process of creating a perforation gun. Unlike a rifle, for example, which is a completed product before it is loaded with ammunition, a perforation gun is not a completed product until the charges are loaded into the carrier. A perforation gun is thus more like a missile, which is not com-

---

15. *Id.* at 6358.

16. *Id.* at 6368.

17. The United States Department of Labor relies on the United States Office of Management and Budget, *Standard Industrial Classification Manual* when it develops OSHA regulations. *See, e.g.,* 57 Fed.Reg. 6356, 6400–01 (Feb. 24, 1992); *see also* 8 AAC 61.225.

18. *See, e.g.,* Webster's Third New International Dictionary 1378 (1967) ("manufacture" includes not only the creation of a product from raw materials but also the creation of a product "according to an organized plan and with a division of labor").

19. 29 C.F.R. § 1910.109(a)(3).

20. *Id.*

21. *Id.*

22. *See id.* ("[t]he term 'explosives' ... includes but is not limited to [the specific items described in the rule]").

47

pleted until the explosive components are loaded into the carrier.[23]

The purpose behind the OSHA regulations also supports the conclusion that perforation guns fall within the category of "explosives."[24] OSHA relies on groupings of "unique hazards" when developing safety and health rules for the workplace.[25] The process of assembling perforation guns entails maneuvering explosives and components of explosives, thus creating friction. When one works with components that explode in the presence of friction, there is a likelihood that the device will be triggered accidentally, through human error—precisely what appears to have happened in the present case. Since these very hazards convinced the federal Department of Labor that the manufacture of explosives ought to be covered by the process safety management regulation, the underlying purpose of OSHA supports interpreting the explosives regulation to define the assembly of perforation guns as the "manufacture of explosives."[26] We thus conclude that the manufacture of perforation guns is the manufacture of "explosives."

C. *Halliburton's Assembly of Perforation Guns Does Not Fall Within the Process Safety Management Regulation's Exemption for Oil Well Servicing Operations.*

■ Halliburton argues that even if the assembly of perforation guns is the "manufacture" of "explosives," the standards do not apply because the process falls within the process safety management regulation's ex-

emption for "oil or gas well drilling or servicing operations."[27]

Preliminarily, we note that it is not entirely clear that the "oil well servicing" exemption contained in the primary process safety management regulation applies to activities regulated under the Alaska Explosives Code. The explosives regulation commanded that "[t]he manufacture of explosives as defined [in the code] must also meet the *requirements* contained in Subchapter 18, Process safety management of highly hazardous chemicals, explosives, and blasting agents."[28] This reference to the process safety management regulation's "requirements" is potentially distinguishable from an incorporation by reference of the process safety management regulation in toto; for it arguably incorporates only the regulation's affirmative commands, excluding its exemptions.

But assuming that the exemption for oil well servicing activities extends to manufacturers of explosives, we conclude that manufacturing perforation guns does not fall within this exemption because it is not an "oil well servicing" activity. In arguing for the exemption, Halliburton relies on language in the Federal Register describing the scope of proposed 29 C.F.R. § 1910.270—the proposed rule establishing safety requirements for oil well servicing activities. The Federal Register described the proposed rule as containing "requirements for drilling, servicing and related operations performed on, *or in support of,* potential and actual oil and gas wells."[29] Halliburton emphasizes that it custom-assembles each perforation gun to the client's specifications and then transports the gun to the site and carries out the perforat-

23. Indeed, an interpretive letter issued to a defense company prior to the April 1994 explosion states:

> The [process safety management] standard covers manufacturing processes when the resulting finished products are intended to explode. For example, an employer obtains an explosive device manufactured by another employer. This explosive device is a subassembly for a weapon which is manufactured by the employer. Both employers must comply with the [process safety management] standard. . . .

24. *See, e.g., Diebold, Inc. v. Marshall*, 585 F.2d 1327, 1333–34 (6th Cir.1978) (providing that interpretation of OSHA regulations should be guided by their purpose).

25. *See* 48 Fed.Reg. 57,202 (Dec. 28, 1983); 57 Fed.Reg. 6369.

26. *See* 57 Fed.Reg. 6367–69.

27. 29 C.F.R. § 1910.119(a)(2)(ii).

28. 8 AAC 61.010, subch. 9, Explosives Code, § 09.110(a)(2) (1994) (emphasis added).

29. 48 Fed.Reg. 57,217 (to have been codified at 29 C.F.R. § 1910.270) (proposed Dec. 28, 1983) (emphasis added).

ing service itself. Halliburton thus reasons that the assembly of a perforation gun is a "mandatory step" in providing "service" to its host oil companies.

The state responds that manufacturing perforation guns and perforating wells are separate activities for occupational health and safety purposes. We agree with the state.

The *Standard Industrial Classification Manual* labels the "perforating of well casings on a contract basis" an "oil and gas field service." [30] But the assembly of an item and the use of an item often fall in different industrial categories. [31] In this case, perforation gun assembly fits better within the manual's descriptions of either "explosive manufacturing" or the manufacture of "oil and gas field machinery and equipment." [32] Halliburton does not become exempt when performing as a manufacturer merely because it also performs oil and gas field services.

For example, conceivably, Halliburton could contract out the manufacturing phase of its operation to a company that only performs this function. That company would have difficulty maintaining, as Halliburton does here, that it falls within the oil well servicing exemption. Halliburton's argument has surface appeal only because the company both manufactures the guns and performs the perforating service. But because each activity entails unique occupational health and safety hazards, the argument for extending the "oil field service" exemption to both activities is fundamentally misguided.

This point is aptly demonstrated in the proposed regulation covering oil and gas well

drilling and servicing activities that OSHA issued in 1983, [33] which suggests that the actual perforating service falls within the exemption but that the manufacture of the perforation gun does not: "Perforating has unique problems associated with the handling of explosives. Requirements proposed address these problems in accord with good practices in the industry. (see References 1, 5, 6, and 7)." [34]

The references cited in this proposed regulation all describe problems uniquely associated with on-site servicing. Reference 1 discusses medical and first aid procedures "at well sites" which attempt to account for "the high mobility of a rig involved in servicing and special services operations." [35] Reference 5 discusses "housekeeping," or "tripping and slipping hazards . . . in work areas, the doghouse, change rooms, and on stairs and ramps" and specifies that "the entire drill floor [must] be washed and hosed down." [36] Reference 6 discusses illumination ". . . on the rig," and reference 7 discusses "[r]aising or lowering derrick or mast and rig-up operations." [37] The proposed regulation thus makes it clear that in discussing the activity of perforation, OSHA dealt with on-site issues associated with the actual sending of the perforation gun down the well. In keeping with the proposed regulation's language, Thomas Seymour, OSHA's acting director for compliance programs, testified at Halliburton's hearing that in the proposed regulation, OSHA intended to exempt the *Standard Industrial Classification Manual*'s categories for "drilling" (category 1381) and "perforating" (category 1389). [38] But Seymour did not testify that OSHA intended to exempt any of the "manufacturing" categories in the pro-

---

30. *Standard Industrial Classification Manual* at 46–47 (1987).

31. *See generally id.* at 67–263 (manufacturing division); *id.* at 353–419 (service division).

32. *See id.* at 148–49 (industry group number 2892 includes "well shooting torpedoes"); *id.* at 203 (industry group number 3533 includes oil well drilling and field tools, generally).

33. *See* 48 Fed.Reg. 57,202 (to have been codified at 29 C.F.R. § 1910.270) (proposed Dec. 28, 1983). While this regulation was never finalized, it provides valuable insight into OSHA's intent

regarding the scope of the rule. *Cf. Elisovsky v. State*, 592 P.2d 1221, 1229 (Alaska 1979) (relying on content of proposed state evidence rule to decide case).

34. 48 Fed.Reg. 57,213.

35. *Id.* at 57,229.

36. *Id.* at 57,231.

37. *Id.*

38. *See Standard Industrial Classification Manual* at 46–47.

posed oil well servicing regulation (category 2892 or 3533).[39] To the contrary, he testified that "[w]e were intending to cover the actual action of perforating the wells ... but we're trying to make it clear that the [process safety management] standard and what is in [the explosive regulation] triggers [process safety management] coverage for explosive manufacturing."

Moreover, in the process safety management regulation itself, OSHA specified that it created the oil well servicing exemption because it had already undertaken separate rulemaking—the proposed rule just described above—for oil well servicing. OSHA believed that a separate regulation covering all oil well servicing activities would enable it to address the "unique hazards" associated with the oil and gas well servicing industry.[40] The language of the proposed regulation specifically indicates that these "unique hazards" are site related:

> The drilling and servicing industry is involved in locating and extracting underground deposits of oil and gas and in maintaining the equipment used to bring the oil and gas to the surface.... Unique hazards include those related to the cathead, rotary table, and well pressures. Hazards which are common to many industries including the oil and gas well drilling and

servicing industry are falls from elevated platforms, slipping/tripping hazards and machine guarding hazards.[41]

The proposed regulation is thus replete with examples of the type of conditions that inspired the separate rule.[42] All of the examples, definitions, and elaborations in that regulation relate to on-site hazards, such as "[f]alls from the derrick." None remotely addresses the gun manufacturing stage.

The regulatory impact assessment accompanying the proposed regulations also suggests that sometimes companies that qualify as "oil well servicing" companies or that support such companies will not be covered by the exemption:

> The following discussion attempts to characterize the oil and gas well servicing industry, particularly that portion of the industry subject to the OSHA proposal....
> The industry includes those firms that provide common "downhole" services such as well servicing, workover, completion, and abandonment.... Also covered in [the Oil and Gas Field Services classification] are all other oil field service firms that do not undertake "downhole" operations. These firms may provide water and waste handling services ... or other support activities. Some of the firms that are part of [the Oil and Gas Field Services classifica-

---

39. *See id.* at 148, 203.

40. OSHA also proposed to exclude oil and gas well drilling and servicing operations because OSHA had already undertaken rulemaking with regard to these activities (48 [Fed.Reg.] 57,202). OSHA continues to believe that oil and gas well drilling and servicing operations should be covered in a standard designed to address the uniqueness of that industry. This exclusion is retained in the final standard since OSHA continues to believe that a separate standard dealing with such operations is necessary. 57 Fed.Reg. at 6369. *See also* 48 Fed.Reg. 57,-202 (proposed oil and gas well drilling and servicing regulation).

41. 48 Fed.Reg. at 57,202.

42. A combination of factors, including tremendous variation in working conditions, high mobility of operations, extremely high employee turnover rate, and limited accessibility of many worksites, convinced OSHA that employees would be better served by developing a standard more specifically tailored to the needs of this industry

*Id.* at 57,205.
Many hazards found on oil and gas well drilling and servicing rigs are common to virtually all workplaces and these hazards are addressed by the OSHA General Industry Standards [29 CFR Part 1910] which will continue to apply. However, this industry has many unique hazards or special work circumstances which require special standards. Therefore, these industry-specific problems—the unique hazards—are addressed in the proposed rule.
The selection of the proposed requirements to be added to Part 1910 are based upon (1) the situations where the general duty clause (Section 5(a)(1) of the Act) has been invoked: for example, *using the rotary table to breakout drill pipe* (Reference 6); (2) *the special situations dictated by the location of operations, for example, medical and first aid requirements and emergency planning;* (3) *the unusual or specialized equipment, for example, catheads, drawworks, and rotary tables;* and, (4) *the specialized procedures in this industry, for example, cementing, drill stem testing, and wireline operations.*
*Id.* at 57,203 (emphasis added).

tion] such as those not involved in "down-hole" operations are not affected by the proposed standard but instead are covered by Part 1910 or 1926 of the OSHA standards.[43]

Accordingly, the key to the applicability analysis is not the company's ultimate or primary goal or even whether the activity is on-site or off-site, but whether the activity poses any of the "unique hazards" associated with oil and gas well servicing and drilling operations. We have noted that OSHA considers the manufacturing stage to be conceptually and practically separate from the operation stage. And we have concluded that manufacturing perforation guns presents hazards similar to those associated with other explosives, not those associated with well servicing. We thus conclude that OSHA did not intend to include the manufacture of perforation guns in the oil well servicing exemption. It is far more logical, and more consistent with OSHA's purposes, to conclude that the manufacture of the perforation gun must comply with the explosives code and thus the process safety management regulation.

D. *The Process Safety Management Regulation, 29 C.F.R 1910.119, Is Not Unconstitutionally Vague as Applied to Halliburton's Manufacture of Perforation Guns.*

■ The superior court held that Halliburton did not have constitutionally sufficient notice that manufacturing perforation guns was governed by the process safety management regulation's requirements.[44] Halliburton agrees with this portion of the superior court's ruling, arguing that the oil well servicing regulation is unconstitutionally vague because it failed to give Halliburton adequate warning that its activities did not fall within the oil well servicing exemption.[45]

■ We recognize that a law may be unconstitutionally vague if the scope of exceptions and the scope of defenses are unclear.[46] In cases not affecting first amendment rights, this court considers two elements in evaluating whether a law is void for vagueness.[47] First, we consider whether there is a history or a strong likelihood of arbitrary enforcement and uneven application.[48] Second, we determine whether the regulation provides adequate notice of prohibited conduct.[49] When evaluating whether an OSHA regulation is void for vagueness, we must determine whether the regulation is vague as applied to the particular conduct for which a citation was issued.[50]

Addressing the first element of the vagueness analysis, the superior court noted that Halliburton had not shown any "history of arbitrary or selective enforcement" of the process safety management regulation. Halliburton concedes that there is no history of

43. Occupational Safety and Health Admin., U.S. Dep't of Labor, *Preliminary Regulatory Impact Assessment and Regulatory Flexibility Certification Assessment of the Proposed Standard for Oil and Gas Well Drilling and Services* II–10 (1983).

44. The board declined to rule on this issue, stating that it was including the claim only to preserve it for judicial review.

45. The regulation reads, in relevant part:

(a) *Scope and application.* (1) *Scope.* This section contains requirements for drilling, servicing and related operations performed on, *or in support of,* potential and actual oil and gas wells, including injection wells and water supply wells. The standard addresses hazards associated with assembling and disassembling rigs, rotary drilling, well servicing, cementing, drill stem testing, well completion, wireline services, and acidizing . . . .

48 Fed.Reg. 57,217 (emphasis added).

46. *See State v. Rice,* 626 P.2d 104, 109–10 (Alaska 1981). We exercise our independent judgment on constitutional issues. *See Chiropractors for Justice v. State,* 895 P.2d 962, 966 (Alaska 1995).

47. *See Lazy Mountain Land Club v. Matanuska-Susitna Borough Bd. of Adjustment & Appeals,* 904 P.2d 373, 383 (Alaska 1995).

48. *See id.*

49. *See id.; Summers v. Anchorage,* 589 P.2d 863, 867 (Alaska 1979).

50. *See, e.g., Martin v. OSHRC,* 941 F.2d 1051, 1058 (10th Cir.1991); *Diebold, Inc. v. Marshall,* 585 F.2d 1327, 1336 (5th Cir.1978) (citing *United States v. National Dairy Products Corp.,* 372 U.S. 29, 36, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963)).

arbitrary or selective enforcement. Halliburton also fails to present any convincing reason to believe that the regulation poses a strong likelihood of future arbitrary enforcement. We thus turn to the second element—whether the process safety management regulation afforded Halliburton adequate notice.

■ We have recognized, in accord with the United States Supreme Court, that a law "which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." [51] On the other hand, we recognize that "[s]o long as the mandate affords a reasonable warning of the prescribed conduct in light of common understanding and practice, it will pass muster." [52]

The framework established by federal courts in analyzing vagueness challenges to OSHA regulations guides our inquiry here. A majority of these courts evaluate whether an employer familiar with the industry could reasonably be expected to have adequate warning of the conduct required by the regulation.[53] Most of these courts consider industry custom and standards probative, but not determinative, on the issue of reasonable-

ness.[54] Many of these courts are also more likely to conclude that a regulation is void for vagueness in the presence of conflicting administrative interpretations.[55]

Here, as we have already observed, OSHA's proposed rule establishing safety standards for oil well servicing activities refers consistently and exclusively to the "unique hazards" associated with operations performed at the well site.[56] And the "unique hazards" associated with oil well servicing differ significantly from the "unique hazards" of manufacturing explosives; these latter hazards are almost entirely ignored in OSHA's proposed well-servicing safety regulation.[57] Moreover, the *Standard Industrial Classification Manual* indicates that OSHA consistently differentiates between the manufacture of a product and its use in a servicing operation.[58] Thus a company in Halliburton's position reasonably should have been aware of OSHA's reliance on the "unique hazards" standard and reasonably could have foreseen that this standard strongly supported resolving uncertainty in favor of construing the manufacture of perforation guns to fall outside the exemption.

■ Halliburton argues that the common industry understanding is that process safety

51. *Lazy Mountain*, 904 P.2d at 382 (quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926)); *see also Allis–Chalmers Corp. v. OSHRC*, 542 F.2d 27, 30 (7th Cir.1976); *United States v. Pitt–Des Moines*, 970 F.Supp. 1346, 1350 (N.D.Ill.1997).

52. *See, e.g., Vanco Constr., Inc. v. Donovan*, 723 F.2d 410, 412 (5th Cir.1984).

53. *See Martin v. American Cyanamid Co.*, 5 F.3d 140, 146 (6th Cir.1993); *Donovan v. Royal Logging Co.*, 645 F.2d 822, 831 (9th Cir.1981); *Allis–Chalmers Corp.*, 542 F.2d at 30; *Cape & Vineyard Div. v. OSHRC*, 512 F.2d 1148, 1152 (1st Cir. 1975); *see also, e.g., Georgia Pacific Corp. v. OSHRC*, 25 F.3d 999, 1005 (11th Cir.1994) ("When considering remedial legislation such as the OSH Act and its implementing regulation, the purported vagueness of a standard is judged in light of its application to the facts of the case.").

54. *See, e.g., Ray Evers Welding Co. v. OSHRC*, 625 F.2d 726, 732 (6th Cir.1980) ("Industry standards and customs are not entirely determinative of reasonableness because there may be instances where a whole industry has been negligent in [following safety procedures]."); *General Dynam-*

ics Corp. v. OSHRC, 599 F.2d 453, 464 (1st Cir.1979).

55. *See Georgia Pacific Corp.*, 25 F.3d at 1005–06; *Kent Nowlin Constr. Co. v. Occupational Safety and Health Review Commission*, 593 F.2d 368, 370–71 (10th Cir.1979); *see also Martin v. OSHRC*, 499 U.S. 144, 157, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991) ("Whether the Secretary has consistently applied the interpretation embodied in the citation [is] a factor bearing on the reasonableness of the Secretary's position.").

56. *See* 48 Fed.Reg. 57,202–35 (Dec. 28, 1983). Federal OSHA cases evaluating the applicability of other safety regulations to certain processes also focus on the particular hazards associated with those processes. *See, e.g., S & H Riggers & Erectors v. OSHRC*, 659 F.2d 1273, 1283 (5th Cir.1981) (evaluating the hazards peculiar to the roofing industry).

57. *See* 48 Fed.Reg. 57,220–22 (discussing medical, first aid, and emergency planning).

58. *Compare Standard Industrial Classification Manual* at 67–263 (manufacturing division) *with id.* at 353–419 (service division).

management standards do not apply to the assembly of perforation guns. But Halliburton has offered little persuasive evidence that an actual industry standard existed before the disputed accident or that Halliburton relied on that standard. At the board hearing, Halliburton's regional safety administrator Steven Sellers testified that, since the accident, he had surveyed other oil and gas well servicing companies and found that they do not comply with process safety management. But the board properly rejected this evidence as irrelevant.

Michael Clark, executive vice president of the Association of Oil Well Servicing Contractors, similarly testified that "[t]o the best of my knowledge," none of the association members who assemble perforation guns comply with the process safety management standards. But when challenged on cross-examination whether he "kn[e]w for a fact" that these companies were not complying with process safety management, he admitted "No ... I do not have that knowledge." Clark further testified that he had not been advised of any citations by state or federal occupational safety and health agencies for violating these standards. But he also testified that even Halliburton did not contact him when it was cited in the present case until a month before the board hearing.

The testimony offered by these two witnesses suffers from another, more basic, problem. Both witnesses stated that oil well servicing companies generally fail to comply with process safety management requirements. But widespread lack of compliance does not in itself establish the existence of an actual industry standard; it may merely reflect a widespread resistance to regulation.[59] Here, neither witness offered evidence of an actual standard.

Halliburton further complains, however, that OSHA has issued conflicting interpretations of the process safety management regulation. According to Halliburton, "[n]either the various regional offices throughout the

United States nor the experts have been able to settle on a single definition of 'servicing operations.'" Halliburton relies on two OSHA opinion letters, written in the aftermath of Halliburton's Kenai facility explosion, that discuss whether process safety management standards applied to the surrounding circumstances of this case.

One of these letters, written by an OSHA Region X official, concluded that the process safety management standards applied to Halliburton. Halliburton contends that this letter conflicted with an earlier OSHA letter. That earlier letter was prompted by an inquiry to OSHA from a Kenai attorney, Jeffrey Jefferson, who represented the estate of the worker killed in the Halliburton blast.

In writing to OSHA, Jefferson's intent was to ascertain whether Phillips Petroleum—the oil company that hired Halliburton to build the perforation guns—bore any legal responsibility in connection with the explosion at Halliburton's Kenai facility. Jefferson's inquiry was based on subsection (h) of the process safety management regulation, which sets forth contractor training requirements for processes subject to process safety management standards.[60] For example, subsection (h)(2)(i) mandates that "[t]he employer, when selecting a contractor, shall obtain and evaluate information regarding the contract employer's safety performance and programs."[61] Jefferson thus needed to know whether Phillips Petroleum had a duty to comply with the requirements of section (h) when it hired Halliburton.

In his letter, Jefferson described the precise circumstances of the Kenai explosion. He specifically stated that Phillips Petroleum retained Halliburton to manufacture perforation guns off site. He also noted that the guns were later transported by another subcontractor's employees to the oil platform, and then detonated by Halliburton employees. Jefferson inquired whether,

when [Phillips Petroleum] undertook to retain [Halliburton] to assemble the perfor-

**59.** *See Ray Evers Welding,* 625 F.2d at 732.

**60.** *See* 29 C.F.R. § 1910.119(h).

**61.** Section 1910.119(h)(2) covers various "employer responsibilities" with respect to employers who hire contractors. *Compare* section (h)(2) *with* section (h)(3), which covers "contract employer responsibilities."

ation guns specific for the well job it was undertaking, does the [process safety management regulation] view [Phillips Petroleum] as an employer who is selecting a subcontractor performing specialty work on a [process subject to process safety management standards], and who therefore has an obligation to obtain and evaluate information regarding [Halliburton's] safety performance and programs?

In response to Jefferson's letter, OSHA Director John Miles wrote:

> [I]n the factual setting that you describe, [Phillips Petroleum] is not considered by OSHA to be responsible for [process safety management] obligations to the extent [Halliburton] is retained exclusively to do work for an oil or gas well drilling or servicing operation. The basis for that obligation, to assure that employers do not introduce additional hazards to covered processes, would not apply if [Halliburton] has contact only with [Phillips Petroleum] employees working in processes excepted from coverage under the [process safety management] standard.

Halliburton claims that this letter states that perforation gun manufacturing is a "process[ ] excepted from coverage under the [process safety management] standard." We disagree.

Although Miles's response to Jefferson's letter is not artfully worded, Miles offers no opinion on whether the process safety management regulation applies to the manufacture of perforation guns. The key to understanding the import of Miles's advice is the following sentence:

> The basis for [the employer's training obligation], to assure that employers do not introduce additional hazards to [processes subject to process safety management standards], would not apply if [Halliburton] has contact only with [Phillips Petroleum] employees working in processes excepted from coverage under the [process safety management] standard.

In reading this sentence, it is important to bear in mind that the OSHA regulation requires "host-employer" review of contractor safety standards because of the danger that, by hiring a contractor like Halliburton, a host employer like Phillips might "introduce additional hazards" to its own "covered processes"—that is, to activities of its own that are already subject to the process safety management regulation.[62] But under Jefferson's hypothetical facts, Halliburton employees would never interact with Phillips employees at Halliburton's Kenai facility; employees of the two companies had contact only when Halliburton actually perforated wells at Phillips's well sites. The ordinary drilling activities engaged in by Phillips are not subject to the process safety management standards; likewise, it is undisputed that perforation is itself exempt from the standards as a core "oil well servicing activity."

As Miles pointed out in his letter, in the situation posited by Jefferson, employees of the subcontractor—Halliburton—could introduce no "additional hazards" to any "covered process" of the host employer—Phillips—for the simple reason that all of Phillips's well-site activities were exempt from the process safety management regulation. Miles's letter says only that, given the limited sphere of Phillips's and Halliburton's interaction, which centered around on-site perforation, Phillips had no obligation to inquire into and ensure Halliburton's compliance with process safety management standards. Miles neither says nor implies anything about Halliburton's own duty to comply with these standards outside the undisputedly exempt sphere of actual perforation service.

Indeed, had Miles intended to assert that the manufacturing process was exempt from

---

**62.** *See* 57 Fed.Reg. 6384 (Feb. 24, 1992) (explaining that "employees of an independent contractor are still employees ... and they and their employers must not only follow the process safety management rule, but they must also take care that they do nothing to endanger the safety of those working nearby who work for another employer."); *id.* at 6385 ("[E]mployer [must] inform contractors performing work on or near a process, of the known potential fire, explosion or toxic release hazards related to the contractor's work and the process."); *id.* at 6386 ("OSHA intended to cover those contractors whose work brings them into direct contact with, or whose work could affect the hazards of processes covered by the [process safety management] standard.").

the safety standards, he would have had no need to explain that the "basis of the [oversight] obligation" was to ensure that, by contracting with Halliburton, Phillips did not introduce additional hazards into its own covered processes. Miles could simply have stated that Phillips had no oversight obligation because all of Halliburton's activities, from manufacturing through perforation, were exempt from process safety management coverage. Miles's letter thus provides no evidentiary support for Halliburton's suggestion that OSHA considered the manufacture of perforation guns an exempt process. Instead, it reinforces our conclusion that OSHA consistently deemed the manufacturing aspect and the servicing aspect of the perforation gun industry to be separate activities governed by separate safety standards.

As further evidence of agency conflict, however, Halliburton points to the testimony of OSHA official Seymour, who stated that OSHA had vacillated in the past:

> We know that there's been mixed signals sent by the agency as to what is meant by manufacturing explosives. And as we try to further clarify that for those that have very specific questions, we've gotten ourselves into a little bit of difficulty where we've tried to give exemptions saying it's a retail facility when in fact, it was not. But you're correct in saying that we've kind of given different signals at different times. But ... we've come together as we get more clarification about the issues and so on, to make it clear as to what is required.

But Seymour made this statement in the context of a discussion about the definition of "retail facilities," not about whether perforation guns are explosives or whether manufacturing these guns is an activity in support of oil well servicing. Moreover, Seymour

never explained what he meant by his reference "mixed signals." And Halliburton fails to provide any other insight into its meaning. The statement stands as an unexplained assertion concerning a matter that has no direct bearing on Halliburton's specific vagueness claim.

In opposition to Halliburton's claim of conflicting agency interpretations, the state argues persuasively that the federal Department of Labor has consistently maintained that the process safety management regulation applies to Halliburton's perforation gun operation. OSHA appears committed to the position that process safety management standards apply to the manufacture of perforation guns because this process is "explosives" manufacturing and not an "oil well servicing" operation. In November 1995 Director Miles signed a memo that affirmed the Region X analysis of Halliburton's Kenai operations. OSHA adopted a similar interpretation in a 1997 administrative decision, *Secretary of Labor v. MEI Holdings, Inc.*[63]

Courts holding that conflicting agency interpretations are a sign of vagueness reason that if administrative officials cannot agree on the meaning of a regulation, then a regulated entity cannot be expected to understand the meaning either.[64] But Halliburton presented no clear evidence that OSHA has ever taken inconsistent positions on the issue of whether the manufacture of perforation guns is a process covered by the process safety management regulation. At most Halliburton presented one letter, written after the fact, arguably suggesting—indirectly—that process safety management standards might not apply. There is no substantial evidence that OSHA took this position prior to the issuance of the citation in this case.[65] And Halliburton offers no evi-

**63.** 1997 OSHD (CCH) ¶ 31,448 (Oct. 27, 1997) *available in* 1997 WL 672049 (O.S.H.R.C.).

**64.** *See Georgia Pacific Corp. v. OSHRC,* 25 F.3d 999, 1005–06 (11th Cir.1994) (holding that "where the Secretary is unable to settle upon a single definition of a critical term or phrase of its own regulation, ... the regulation is unconstitutionally vague as applied for failing to give sufficient guidance to those who ... are subject to civil penalties"); *Kent Nowlin Const. Co. v. OSHRC,* 593 F.2d 368, 371 (10th Cir.1979).

**65.** The record contains at least some suggestion that if Halliburton had asked OSHA for an opinion, OSHA would have concluded that the process safety management standards applied to the manufacture of perforation guns. An interpretive letter issued to a defense company prior to the April 1994 explosion states:

> [The process safety management] standard covers manufacturing processes when the resulting finished products are intended to explode. For example, an employer obtains an explosive device manufactured by another em-

dence at all that it actually relied on any specific statement or position by OSHA before the fatal explosion.

Halliburton nonetheless points out that the United States Supreme Court has recognized that "the decision to use a citation as the initial means for announcing a particular interpretation may bear on the adequacy of notice to regulated parties."[66] But in the case on which that statement is founded, *N.L.R.B. v. Bell Aerospace Co.*, the Supreme Court also recognized that an agency "is not precluded from announcing new principles in an adjudicative proceeding and that the choice between rulemaking and adjudication lies in the first instance within the [agency's] discretion."[67] In that case, the Supreme Court noted that the agency should not be precluded from reconsidering an issue in an adjudicative proceeding unless there are substantial adverse consequences resulting from reliance on past interpretations.[68]

Here, the state's decision to issue a citation is hardly surprising in light of the seriousness of the incident that prompted this action. And the citation signaled no change in any previously established rule or policy. Rather, it announced an interpretation of the process safety management regulation that can fairly be implied from its purpose, content, and legislative history, as well as from related regulations and statutes.

The superior court felt that retroactive application of the process safety management regulation would create a problem of vagueness because "Halliburton cannot be expected to define [the oil well servicing] exemption by resorting to negative definitions based on what other proposed regulations purport to include in their purview." We disagree.

 A large and sophisticated company involved in hazardous activities within a heavily regulated industry bears a substantial burden of inquiry concerning applicable safety standards.[69] The company must make itself aware of a governing law's wording, become acquainted with its legislative history, and consult other relevant sources to ascertain its meaning. And when such study reveals two possible interpretations, one of which would promote safer and healthier working conditions,[70] the company's choice of the more perilous course is little more than a calculated risk. For "the fact that people can, in good faith, litigate the meaning of a statute does not necessarily (or even usually) mean that the law is so indefinite as to be unconstitutional."[71] Here, we conclude that the language of the process safety management regulation is not so vague that it corrupted Halliburton's analysis of its obligations or otherwise directed the choice that Halliburton ultimately made.

## IV. CONCLUSION

We AFFIRM the superior court's determination that the process safety management standards applied to Halliburton's manufacture of perforation guns because this procedure involves the manufacture of explosives. But we REVERSE the court's ruling that the process safety management regulation was unconstitutionally vague as applied to the facts that resulted in Halliburton's citation and penalty. Accordingly, we AFFIRM the board's order imposing a penalty against Halliburton.

ployer. This explosive device is a subassembly for a [product] which is manufactured by the employer. Both employers must comply with the [process safety management] standard....

66. *Martin v. OSHRC*, 499 U.S. 144, 146, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991).

67. 416 U.S. 267, 294, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974).

68. *See id.* at 295, 94 S.Ct. 1757.

69. *See Diebold, Inc. v. Marshall*, 585 F.2d 1327, 1337 (6th Cir.1978) (noting that "a duty of inquiry may properly be imposed on those engaged in business enterprises").

70. *See* 29 U.S.C. § 651(b). *See generally Atlas Roofing Co. v. OSHRC*, 430 U.S. 442, 444–45, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977) (discussing purpose of OSHA).

71. *DeNardo v. State*, 819 P.2d 903, 908 (Alaska App.1991).